THE SECOND NATIONAL BANK OF OSWEGO, Respondent, *v.* ERASTUS P. BURT, Appellant.

| 93 | 233 |
|----|-----|
| 124 | 449 |

Where the duty is imposed upon the cashier of a bank of carrying on its business, he cannot be held responsible for a neglect of duty in not consulting other officers of the bank or committees, whom by the by-laws he is required to consult in making discounts, where said committees hold no meetings and the officers systematically absent themselves from the performance of their duties.

Plaintiff's by-laws directed that there should be "a standing committee known as the exchange committee, consisting of the president, cashier and one director," having power to discount bills, etc., who were required to report at each meeting of the board of directors. To the cashier was given power, with the assent of the president, to "make discounts of an ordinary character." When the committee was not in session, such discounts to be reported at its next meeting. No such committee appears to have ever been appointed. A discount committee of directors was appointed by the board, also an advisory and executive committee, but, so far as appeared, neither committee ever held a meeting. In January, 1873, plaintiff's president announced to the board of directors that he could not thereafter actively perform the duties of his office, and requested the appointment of a committee to examine, from time to time, its financial condition. Such a committee was appointed, with directions to investigate " three or four times each year." Thereafter the president took no active part in the business. Defendant, who was plaintiff's cashier, with the knowledge and at least tacit consent of the president and directors, discounted certain drafts, the drawers and drawees of which, at the time of the discounts, possessed the highest degree of commercial credit, but before the maturity of the paper became insolvent. In an action to charge defendant with the loss, *held,* that under the circumstances defendant's duty, prior to the passage of said resolution, simply required him to consult with the president in making discounts; and that by the resolution all restriction upon his power was intended to be practically abrogated, and in the absence of any claim of want of integrity, judgment or skill on his part, he was not liable.

By another of plaintiff's by-laws, the names of two responsible persons were required upon discounted paper, the name of a firm being considered as one person. The drafts in question were drawn by the firm of P. & Co. upon W. & Co. Both firms were composed of the same members. The business of the two firms was, however, separate and distinct. The former bought and manufactured lumber, at Oswego, shipping it to W. & Co., at Albany, for sale. The latter firm was also consignee for other parties, selling on commission. *Held,* that the drawers and drawees

SICKELS — VOL. XLVIII.    30

constituted two firms within the meaning of the by-laws, and even if defendant knew they were composed of the same persons, he was not chargeable with a violation thereof ; also that defendant was not required to ascertain the individual names of the members of a firm remote from his place of business, which appeared upon paper offered for discount.

Also *held*, that the drafts in question came within the meaning of the clause in the National Banking Act (§.29), exempting *bona fide* bills of exchange, drawn upon actually existing values, from the prohibition against loans by national banks to a single person or firm, in excess of one-tenth of its capital ; that to bring a case within the exception it was immaterial whether the bill was accompanied by a specific bill of lading, or was drawn against property previously consigned, and which property or its proceeds still remained in the hands of the consignees.

Also *held*, that in the absence of evidence it could not be assumed that W. & Co. were not, at the time the drafts were discounted, in receipt of property from P. & Co., sufficient to meet their requirements.

Defendant, contrary to a resolution of plaintiff's board of directors, discounted his own notes, using the proceeds in the purchase of wheat on speculation. When the transaction came to the knowledge of the directors the wheat lay in store at Oswego. The board immediately removed defendant from his office, because of the violation of said resolution. Defendant thereafter deposited with plaintiff a sum sufficient to pay said notes, declaring at the time to the officers of the bank that the deposit was for that purpose. They received the money, but having done so, refused to deliver up the notes or to return the money. The wheat was sold, after the commencement of this action, and a profit realized. *Held*, that plaintiff had the option at the time of the discovery, either to require a return of the funds unlawfully taken, or a surrender of the property purchased with them, it could not receive its funds and also reclaim the wheat, nor could it assert a right to the profits of the adventure, if any were made, and at the same time repudiate its possible losses ; that the election once made was irrevocable, and when the plaintiff, with knowledge of all the facts, accepted the funds, it surrendered all interest in the wheat and was not entitled to the profits.

The relations of a bank with its cashier are analogous to those of a principal with his agent, and the principles governing the right of disaffirming unauthorized acts of an agent are applicable to similar acts of a cashier.

(Argued June 13, 1883 ; decided October 2, 1883.)

APPEAL from judgment of the General Term of the Supreme Court, in the fourth judicial department, entered upon an order made April 7, 1882, which modified, and affirmed as modified,

a judgment in favor of plaintiff, entered upon the report of a referee.

This action was brought against defendant, a former cashier of the plaintiff, to recover damages alleged to have been sustained, because of defendant's negligence and violation of duty, and to compel him to allow for and pay over profits made by him, by the unlawful use of plaintiff's funds.

The facts so far as material are stated in the opinion.

*William F. Cogswell* for appellant. Plaintiff having, with full knowledge of all the facts, elected to consider Mr. Burt as borrower of the money from the bank, and not to take the chances of the venture which he made with it, is concluded. (*Bostwick* v. *Atkins*, 3 Comst. 53 ; *Alcott* v. *Tioga Railroad Co.*, 40 Barb. 179 ; 27 N. Y. 546 ; *Boerum* v. *Schenck*, 41 id. 182.) Plaintiff cannot, having settled the account and returned the vouchers, claim to recover interest on temporary overdrafts. (*Jacob* v. *Emmett*, 11 Paige, 142 ; *Gillespie* v. *Mayor of N. Y.*, 3 Edw. 512 ; *Southern Central R. R.* v. *Moravia*, 65 Barb. 180.) The two firms of Page & Co. and White & Co., although composed of the same individuals, were two separate and distinct legal entities, within the meaning of plaintiff's bylaw requiring the names of two responsible persons on paper discounted by it. (Story's Eq. Jur., §§ 679–682 ; Parsons on Partnership, chap. 10, § 1, pp. 342–350, m. p. ; *Cole* v. *Reynolds*, 18 N. Y. 74 ; *Terry* v. *Butler*, 43 Barb. 395 ; *Wilson* v. *Robertson*, 21 N. Y. 587 ; *Menagh* v. *Whitwell*, 52 id. 146 ; U. S. R. S., §§ 5074, 5121 ; Bump on Bankruptcy [9th ed.], 592 ; *In re Nims*, 16 Blatch. 439 ; *Forsyth* v. *Woods*, 11 Wall. 484.)

*Albertus Perry* for respondent. The defendant, as director and cashier of the plaintiff, was a trustee and subject to the obligations and disabilities incidental to that relation. (Angell & Ames on Corp., §§ 312–315 ; *Bliss* v. *Mattison*, 45 N. Y. 22, 26 ; *Butts* v. *Wood*, 37 id. 317 ; *Robbins* v. *Smith*, 3 Paige, 222, 231 ; *Scott* v. *Depeyster*, 1 Edw. Ch. 513, 542 ;

*Cumberland Coal Co.* v. *Sherman*, 30 Barb. 553, 571; *Docker* v. *Somes*, 2 M. & K. 655; 1 Story's Eq. Jur., §§ 462, 465; Story on Agency, § 207; Dunlap's Paley on Agency, 49, 51; *Pocock* v. *Reddington*, 5 Ves. 92; *Schieffelin* v. *Stewart*, 1 Johns. Ch. 620; *Brown* v. *Rickets*, 4 id. 303; *Conro* v. *Fort Henry Iron Co.*, 22 Barb. 27, 64; *Dutton* v. *Willner*, 52 N. Y. 312.) The plaintiff did nothing to estop itself from claiming the profits realized by the defendant. (*Brown* v. *Brown*, 30 N. Y. 519; *Gondolfo* v. *Appleton*, 40 id. 533; *Manuf'rs and Traders' B'k* v. *Hazard*, 30 id. 135, 136, 226.) It is no objection to the recovery of the profits by the plaintiff that the wheat was not sold and the amount of profits ascertained until after the commencement of the action. (*Crosbie* v. *Leary*, 6 Bosw. 312; *Taylor* v. *Taylor*, 43 N. Y. 578.) The indorsement by the defendant of the draft of the Thorntons on Starr & Adams to the First National Bank, New York, by signing his name with the addition of " cashier," bound the plaintiff. (*Robb* v. *Ross*, 41 Barb. 586.) There was no ratification by the plaintiff of the defendant's action in the matter. (*Seymour* v. *Wickoff*, 10 N. Y. 213; *Nixon* v. *Palmer*, 8 id. 398; *Brass* v. *Worth*, 40 Barb. 648; *Howell* v. *Christy*, 3 Lans. 238; *Minor* v. *Mechs.' B'k of Alexandria*, 1 Pet. [U. S.] S. C. 46, 70–72; *B'k of St. Mary* v. *Colder*, 3 Strobhart [S. C.], 403; *People* v. *County of N. Y.*, 5 Cow. 331; *Johnson* v. *Brannon*, 5 Johns. 268; *Fake* v. *Eddy*, 15 Wend. 76.) The defendant loaned the money of the plaintiff by discounting the drafts of Page & Co. without authority and in violation of law and of his duty. (U. S. R. S., § 5136, subds. 5, 6.) Page & Co. and White & Co. were not two separate and distinct legal entities, either in fact or law, and did not constitute " two persons," within the meaning of the plaintiff's by-law. (*In re Lane & Co.*, 10 Nat. Bk. Reg. 135; *Morss* v. *Minot*, 10 Cush. 592.) The defendant cannot justify a violation of either of the by-laws by showing the separate and individual action or consent of other directors. As to his power to make discounts, these by-laws were to him the law. (Angell & Ames on Corp., §§ 35, 232; *Brick Presbyterian*

*Church* v. *Mayor, etc., of N. Y.*, 5 Cowen, 538; *Cummings* v. *Webster*, 43 Me. 192; 1 Potter on Corp., § 72, p. 117; *Seneca Co. B'k* v. *Lamb*, 26 Barb. 595; Story on Agency, § 192.) In loaning to Page & Co. more than one-tenth of plaintiff's capital stock defendant was guilty of gross negligence, and for the damages sustained the defendant is liable. (Angell & Ames on Corp., §§ 312, 314; Story on Agency, §§ 217 c., 192 ; Sedgwick on Damages [6th ed.], 400 ; Dunlap's Paley on Agency, 3–6, 71–78 ; *Austin* v. *Daniels,* 4 Denio, 299 ; *Com. B'k of Albany* v. *Ten Eyck,* 48 N. Y. 305; *Loeb* v. *Hellman,* 83 id. 601.) This court has jurisdiction of this action, and is authorized to grant the relief demanded in the complaint. (U. S. R. S., § 5136, subd. 4; id., § 563, subd. 15, and § 629, subd. 10 ; § 5198 as amended by the act approved February 18, 1875 ; *Claflin* v. *Houseman*, 3 Otto, 130·; *B'k of U. S.* v. *Defoe,* 5 Cranch, 61; *Ex parte McNiel*, 13 Wall. 236; *Teal* v. *Felton*, 1 Comst. 537; *S. C.*, 12 How. [U. S.] 292; *Cooke* v. *State Nat. B'k of Boston*, 52 N. Y. 96; *Cook* v. *Whipple*, 55 id. 150; *Robinson* v. *Nat. B'k of Newberne*, 81 id. 385; *Kennedy* v. *Gibson*, 8 Wall. 498; 2 R. S. 462; 4 Stat. at Large, 560.) The adoption of the resolution by plaintiff, and the practical acceptance by the defendant of the proposition therein made by acting upon it, constituted a contract in writing, and the concurrent conversation between Doolittle and defendant were merged in the writing. (Abbott's Trial Evidence, 34; *Argus Co.* v. *Mayor, etc.*, 55 N. Y. 495.)

RUGER, Ch. J. The principal question arising upon this appeal is over the alleged liability of the defendant for a neglect of duty as cashier of the plaintiff in discounting certain drafts drawn by Page & Co., of Oswego, upon White & Co., of Albany, in the months of April and May, 1873, and which were accepted by the drawees. These drafts were lost to the plaintiff on account of the insolvency of Page & Co. and White & Co., whose failure occurred on the 20th of May thereafter. The proceeds, when discounted, were placed to the credit of Page & Co., and the amount of such paper remaining unpaid when

the insolvency of the parties accrued was $24,000. It is to be observed in the outset that no question is made as to any want of integrity, judgment or skill on the part of the cashier in the transaction of the business in question, but he is sought to be held liable solely for his alleged neglect to observe a regulation of the bank. The firms of Page & Co. and White & Co., who were respectively the drawers and drawees of the paper discounted, possessed the highest degree of commercial credit at the time of the discount; and some of the individuals composing these firms were known to have large private fortunes. These discounts were all made with the knowledge, and at least tacit consent, of the president and directors of the bank, and were considered in financial circles as desirable business for a bank to secure. Various regulations of the plaintiff, contained in the articles of association, by-laws and proceedings of the board of directors, were put in evidence as bearing upon the duty of the cashier of the plaintiff in discounting paper offered for that purpose at the bank. Those which are material to the present inquiry are as follows: By-laws, "Sec. 15. The bank shall be open for discount and deposit, and for the payment of notes, drafts and other papers held by the bank, from 10 o'clock, A. M., to 3 o'clock, P. M., each day of the year excepting Sundays and days recognized by the laws of the State as national and religious holidays. *There shall be a standing committee, to be known as the exchange committee, consisting of the president, cashier and one director, appointed by the board every six months*, to continue to act until succeeded, who shall have power to discount bills, notes and other evidences of debt, and to buy and sell bills of exchange, and who shall at each regular meeting of the board make a report of the bills and notes purchased by them since their last report. The president, or cashier, with the assent of the president, shall also have the right to make discounts of an ordinary character, as to amount and kind of security, when the committee is not in session, reporting the same to the committee at their next meeting thereafter, and laying the paper so discounted before them. Sec. 19. Persons applying for

discount shall, in all cases, indorse or guarantee the paper of-
fered.    No note shall be discounted for a less amount than
$50, and to entitle any paper to be discounted, there must be
two names of responsible persons liable upon the same, or
satisfactory collateral security given, the name of a firm being
considered one person.    The names of the individual members
of the firm who are parties to discounted paper shall be ascer-
tained and a memorandum made thereon ; and the cashier shall
take care that the name of a firm shall not be received as
security without clear evidence that all of the members assent
thereto."

It does not appear that an exchange committee was ever ap-
pointed under the above by-laws.    On the 10th day of Jan-
uary, 1871, it does, however, appear from the record of
the proceedings of the directors that "I. L. Jenkins and Gil-
bert Mallison were then appointed a discount committee for
the year."    It does not appear that any other discount com-
mittee was ever appointed, or that these persons ever held a
meeting or acted in that capacity.    It also appears by the pro-
ceedings of the directors for the 9th day of January, 1872,
that "G. B. Johnson, E. P. Burt and Geo. G. French were
appointed advisory and executive committee."    It nowhere
appears what the duty of this committee was or that they ever
held any meeting, or performed any duty in regard to the dis-
count of paper offered at the bank.

On the 23d day of January, 1872, the board passed the fol-
lowing resolution :

"*Resolved,* That no officer of this bank shall have power to
make any loan or discount without the written consent of the
advisory or executive committee, the president and Benjamin
Doolittle, or any two of them."

This resolution was, on the 25th day of May, 1872, re-
scinded by the board.    At a meeting of the board held on the
18th day of January, 1873, the president, Mr. Ames, an-
nounced "that he could not give as much attention to this
bank as formerly, and should take no further compensation for
his services, but in place thereof asked that a committee of

three be appointed, at a compensation of $10 per day each and expenses, whose duty it should be to examine at such times as they deemed best the financial condition of this bank.    Thereupon Messrs. Mallison, Jenkins and French were appointed such a committee at said compensation to investigate the same three or four times each year."

The several drafts of Page & Co., out of which this alleged cause of action arose, were discounted between the 5th day of April and the 15th day of May, 1873, after the appointment of this committee, but the practice of discounting this paper had been going on for several months previous to that time.    The undisputed evidence in the case shows that these several by-laws were from the first uniformly disregarded in the practical management of this bank with the knowledge and acquiescence of its officers.    Such laws were equally as obligatory upon the president and various committees therein referred to as upon the cashier, and impliedly required them either to attend at the bank at stated periods to perform the duties enjoined upon them, or at least to keep themselves accessible to the cashier and in a position to be conveniently consulted by him according to the requirements of the business.    To impose upon the cashier the duty of carrying on the business of a bank and yet hold him responsible for a neglect of duty in not consulting officers and committees who apparently held no meetings and systematically absented themselves from the performance of their duties is an imposition which the law will not tolerate. It would be quite impracticable for the managing officer of a bank required to keep it open daily to leave his place of business as each transaction requiring attention occurred to look up persons engaged in other employments and consult them in regard to such transactions.

The reasonable construction to be given to the resolution of the 18th of January appointing a committee to occasionally investigate the affairs of the bank, taken in connection with the withdrawal of the president from the active performance of his duties, and the practical interpretation thereof by the committee would lead to the conclusion that the restrictions

theretofore existing upon the power of the cashier to discount paper were intended to be practically abrogated. At the time of this meeting, if any such resolution then existed, it was simply a requirement that he should consult the president in regard to discounts. When, therefore, Mr. Ames announced his practical withdrawal from the performance of his duties as president, and a committee was appointed in his place whose duties were defined to be to investigate the affairs of the bank three or four times each year, it could not have been in the contemplation of any one that he intended to perform the daily and hourly duty of supervising the paper offered for discount at the counter of this bank or that the committee appointed in his place was to perform any other duty than that stated in the resolution appointing them.

The resolution must be construed in the light of existing circumstances and the known habitual practice of the cashier to discount business paper as it was offered, subject to the oversight of the president and the executive committee at such times as they saw fit to exercise their power of supervision. But it is unnecessary to enlarge upon these considerations, inasmuch as, not only the judgment of the court below, but also the argument of the respondent's counsel, place the liability of the defendant mainly, if not altogether, upon other grounds. The recovery in this case is attempted to be supported upon an alleged violation of by-law No. 19, in not requiring the names of two responsible persons upon discounted paper, the name of a firm being considered as one person; and also his alleged violation of section 29 of the National Banking Act in allowing the firm of Page & Co. to borrow money from the bank to an amount in excess of one-tenth part of its capital stock upon paper other than discounts of bills of exchange drawn upon actually existing values, or business and commercial paper.

The referee held that both of these provisions were violated by the defendant, and ordered judgment against him for the whole sum of Page & Co.'s paper remaining unpaid, less a

dividend of two per 'cent anticipated from their assets in bankruptcy.

The General Term, however, modified this judgment, holding that the name of E. E. Jubert appearing upon $13,000 of the paper in question, in addition to the names of Page & Co. and White & Co., satisfied the provision of the by-law requiring the names of two responsible persons or firms upon such paper, but they also held that the paper in question not being bills of exchange, drawn upon existing values, or business or commercial paper within the meaning of the National Currency Act, was the discount thereof by the defendant in excess of one-tenth part of its capital stock, viz.: $12,000, and was, therefore, a violation of said act which rendered the defendant liable for such excess.

We are constrained to differ both with the referee and also with the General Term, not only as to the true construction of the by-law requiring the names of two persons or firms upon discounted paper, but also as to the commercial character of the paper in question. The proper consideration of these questions requires a brief reference to the evidence showing the nature and character of the business carried on by the various parties to this paper, and also to the methods employed by them in transacting such business.

The respective firms of Page & Co. and White & Co. were composed of the same individuals, viz.: A. S. Page, S. W. Barnard and D. L. White, engaged in the business of buying, selling, shipping and manufacturing lumber, at Oswego, under the firm name of Page & Co., and at Albany, as White & Co. The same individuals, and one William Jones, were also associated together as members of a firm doing business in Canada as manufacturers of lumber under the firm name of A. S. Page & Co. The general market for all of the lumber dealt in by these parties was at Albany, and White & Co. were not only the general consignees of the various firms, but also of third parties who forwarded lumber on commission to them for sale in the eastern market. In the language of the only witness showing the course of the business pursued by these firms it

appeared that "so far as doing business was concerned Page & Co. and White & Co. were conducted as if they were two separate firms, and strangers, so of keeping their books." "Lumber came forward here (at Oswego) whether purchased, manufactured or consigned on commission. We paid the advances and charges, and made drafts on the consignees for the amount of their charges." It is obvious from the method thus described that each of these firms was in the constant practice of contracting debts, acquiring property and entering into engagements under their respective firm names, which property they would each hold, and which obligations they would each owe irrespective of the other firms for many purposes.

It is quite evident that the firm of White & Co. as the general consignees of the lumber sent forward for market would ultimately be the recipients of the great bulk of such property, and come into possession of the proceeds of its sales. The firm of A. S. Page & Co. and Page & Co. on the other hand would appear from the course of business to be those who would primarily become liable for the cost and expense of buying and manufacturing the lumber, and fitting and forwarding it to market, and the financial inequality which would necessarily and constantly result from this course of business could be corrected only by drafts drawn by the consignors upon and payable by the consignees, or the remittance of funds effected in some other manner. We think, therefore, that the drafts in question came within the meaning of that clause of the National Currency Act providing that *bona fide* bills of exchange drawn upon actual existing values should not be subject to the prohibition against banks lending money to a single person or firm in excess of one-tenth part of their capital.

We think it entirely immaterial whether such bills are accompanied by a specific bill of lading in each case, or are drawn against property previously consigned, and existing either in its original form or in the shape of proceeds of sales in the hands of the consignees. In either case the funds have already

been provided by the drawer in the hands of the drawees to meet the requirements of the obligation.

The object of this provision of the Currency Act was to guard national banks from the hazard of loaning money in improvident amounts upon speculative and accommodation paper, but it contemplated and permitted to an unlimited amount the discount of paper used and required in facilitating the transfer of property and money in the transaction of the legitimate business of the country.

We are required to assume in support of the judgment in this case against the probabilities and without any evidence to sustain it, that White & Co. were not at the time these drafts were discounted in the receipt of property from Page & Co. sufficient to meet their requirements. There is not only an absence of any finding by the referee to sustain this assumption, but such a finding, if made, would have been entirely unsupported by the evidence.

We are, therefore, of the opinion that the court below erred in holding the defendant liable for discounting the paper in question to the amount in excess of the tenth part of the capital stock of the plaintiff, and that such discount comes within the exception as being *bona fide* bills of exchange drawn upon existing values.

Neither do we think that the defendant could justly be held liable under the circumstances of this case in consequence of the provision of the by-law requiring the names of two responsible persons or firms upon discounted paper. Even if he knew that the firms of Page & Co. and White & Co. were composed of the same individuals, he was justified in supposing that they constituted two firms, within the meaning of the by-law. No question arises in this connection as to the mutual rights and liabilities of these several firms as among themselves or to their respective individual members.

The sole question is as to the relation they bear to third persons dealing with them.

It is a general rule, not only in equity but at law, that property held and owned by separate firms is primarily chargeable

with the payment of the debts of the firm holding the property, and it is only after those debts are wholly satisfied that collateral rights in such property can be regarded. ( *Wilson* v. *Robertson*, 21 N. Y. 592; *Menagh* v. *Whitwell*, 52 id. 147; 11 Am. Rep. 683.)

So far as the liability of such firms is concerned they each constitute legal entities, assuming and performing their respective obligations, and each holding exclusive funds to effect the objects of its association. (Parsons on Partnership, 346; *In re Nims*, 16 Blatchford, 439; *Forsyth* v. *Woods*, 11 Wallace, 484.) The legal title to the property acquired by either of these firms would vest in the partnership under their respective firm names and remains liable to the satisfaction of the firm obligations until disposed of in the regular course of partnership business.

Debts contracted by the individuals composing the partnership, either individually or jointly, in any other way than under the firm name, are not entitled to share in the final distribution of the partnership assets until after the discharge of all the partnership obligations. (*Turner* v. *Jaycox*, 40 N. Y. 470; *Menagh* v. *Whitwell, supra.*) It necessarily follows that obligations incurred by the firm of Page & Co. were not entitled to be enforced against the property held under the name of White & Co. until all of the partnership debts of White & Co. had been satisfied.

It is not supposed to create any difference whether these several firms are composed wholly of the same persons or partly of the same persons and others associated with them. The principle upon which the rule rests applies equally to either case. (*In re Nims* and *Forsyth* v. *Woods, supra.*)

It is based upon the equities of the creditors in the property of the firm to whom they have given credit. The property of the creditor has been used to swell the assets of the firm and he thereby becomes equitably entitled to a preference over individual creditors in the payment of his debt from such assets. The credit was presumably given in reliance upon the responsibility of the firm induced by its possession and appar-

ent ownership of its property. (*Menagh* v. *Whitwell, supra;* 2 Kent's Com. 64.) Therefore, when the plaintiff obtained the name of White & Co. upon the paper drawn by Page & Co. they had secured the means of reaching a fund for the payment of their debt, which was previously contingently liable only, and had thereby accomplished the object and intent of the by-law in question.

Neither do we think that the obligation laid upon the cashier by this by-law required him, in all cases where paper was offered for discount at the bank, bearing the name of a firm remote from his place of business, to refuse to enter into a profitable transaction in the usual and ordinary course of business for his principal, or attempt to delay it until he could obtain information from distant points as to the individual names of such firm. Such a course of business would be utterly impracticable, and could not have been within the contemplation of the framers of this by-law. They evidently intended only the investigation of the individual names of the member of firms residing in its vicinity and offering paper for discount. The law should be construed according to the intent of its framers, and not as a trap to catch innocent parties. The uniform acquiescence of the officers and committees of this bank in the course of business pursued by the defendant as cashier in discounting Page & Co.'s paper, and their long delay in making any claim for damages on account of the pretended violation of this by-law, afford the strongest evidence of their approval of the practical construction given to it by the defendant.

It follows from these views that there should have been no recovery against the defendant on account of the transactions relating to the discount of the paper of Page & Co.

The defendant was also held liable for the profits arising out of a certain transaction in the purchase of wheat, in which he engaged in the fall of 1873, with what was claimed to be the funds of the plaintiff.

The material facts out of which this claim arose are briefly as follows :

In November, 1873, the defendant conceived the idea of

speculating in wheat, and engaged with the firm of Ames, Hastings & Co. to jointly purchase a cargo of wheat in Milwaukee, and hold it for the anticipated rise in its value. To raise the necessary funds to accomplish this purpose, he executed his individual promissory notes, payable on demand for the necessary amount, and caused them to be discounted at the plaintiff's bank, and used the funds so obtained in the purchase of the wheat. The act of the defendant in discounting this paper was contrary to the provisions of a resolution of the board of directors of the plaintiff, in force at the time of such discount. When the transaction was discovered by the directors of the bank this wheat lay in store at Oswego undisposed of. The knowledge of this transaction came to the directors on the 23d day of December, 1873. They immediately caused the defendant to be removed from his position as cashier, upon the ground that he had violated the resolution of the board of directors by causing his own paper to be discounted at the bank without the consent or approval of other officers.

On the 10th day of January, 1874, the defendant deposited with the plaintiff a sum more than sufficient to pay the amount of said discounted notes, for the purpose of paying such notes, as was declared by him to the officers of the bank at the time of making the deposit.

The officers received the deposit and after acquiring it refused to deliver up such notes. After demand duly made they also refused to return such moneys, or any part thereof, to the defendant.

At the time of this transaction the speculation in the wheat was still in embryo and might have terminated in a loss. None of the wheat was sold by the defendant until after the commencement of this action.

We agree with the referee in his opinion that "the money used by the defendant in the purchase of said wheat was the plaintiff's money, and they are legally entitled to follow the same into its product, the wheat, and take same and its fruits and products as its own."

"It is doubtless true that the *cestui que trust* has an election to affirm or disaffirm the pretended contract."

The cashier of a bank occupies such a situation with reference to the funds within his control as an officer of the bank that he cannot lawfully use such funds in private speculation to his own profit without the consent of those legally authorized to represent the bank.

In this case the defendant unlawfully took possession of the funds of his principal and was bound, at the option of his principal, either to return the funds unlawfully taken or surrender the property in which they had been invested. The election, which the plaintiff had at this time, was between the disaffirmance of the act of the defendant in borrowing its money and an assertion of the right of acquiring possession of the property bought with such funds, or the reception of the repayment of the loan by its agent.

It could not receive its funds and also reclaim the wheat. It had the right to do either one or the other, and its election to pursue one necessarily constituted a rejection of the other alternative.

The only demand appearing from the evidence to have been made upon the defendant in respect to this transaction was made in the latter part of January, 1873, by one of plaintiffs' directors, and was a peremptory demand for the payment of " $5,000 profits on wheat."

No profits had at that time been realized on the transaction, and it was altogether a matter of speculation whether it resulted in a profit or loss. The same demand was much larger even than the amount eventually realized from the transaction.

The plaintiff never offered to assume the risk of the transaction or requested an immediate sale of the wheat and a determination of the result of the adventure. It simply attempted to secure the benefits of the transaction without offering to incur any risk.

No such right of election accrued as entitled it to take the profits of the adventure if any were made and at the same time to repudiate its possible losses. The transaction was single and entire, it was bound to affirm or disaffirm it, as it then existed in its entirety with the hazards attending it. (*F.*

*L. & Trust Co.* v. *Walworth*, 1 N. Y. 433 ; *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 id. 30.) The relations existing between a banking corporation and its cashier are more analogous to those attending the relation of principal and agent than those of sureties and *cestui que trust*, and the principles governing the right of disaffirming unauthorized acts should be those which obtain as between principal and agent. In the case of adult parties subject to no legal disabilities the adoption or repudiation of a transaction involving the unauthorized use of their funds must be promptly made, upon discovery of the facts, and when once deliberately made is finally made. (*Boerum* v. *Schenck*, 41 N. Y. 182.) The plaintiff in this case had no right to impose upon the defendant the risk attending the final result of the venture, and still claim to hold an interest in it. When it accepted the return of the funds illegally invested by its agent with knowledge of all of the facts it ceased to have any interest in the transaction.

After that time it was carried on, and was consummated exclusively with the money of the defendant and not with trust funds, and he necessarily became entitled to the advantages of the speculation, if any, which resulted from the continuation of the adventure.

We, therefore, think the referee erred in charging the defendant with the amount of the profits finally realized from the speculation in wheat.

We have examined the exceptions taken to the allowance made by the referee of the various other items of charges against the defendant and are satisfied that they were properly allowed.

It follows that the judgment should be reversed and a new trial ordered before another referee unless the plaintiff stipulates to reduce the judgment rendered on the report of the referee for damages to $379.62, in which case the judgment should be affirmed. The appellant should have costs of this appeal.

All concur.

Judgment accordingly.