# Wynn, as Administrator *v.* Tallapoosa County Bank.

*Bill to Enjoin Suit at Law, for an Accounting and to Fasten a Lien Upon Stock for an Amount Found Due.*

(Decided Feb. 26, 1910. Rehearing denied June 30, 1910. 53 South. 228.)

1. *Appeal and Error; Decisions Reviewable; Finality of Determination.*—An appeal cannot be entertained even by consent if the record shows that there was no final decree rendered within a year before the appeal was taken.

2. *Same.*—Where the bill is by a bank against the deceased cashier for an accounting and enforcement of a lien upon his stock in the bank, and his deposits there, a decree declaring complainant entitled to relief and referring to the register the ascertainment of the amount due, and the decree confirming the former decree and the register's report, and decreeing that complainant recover a specific sum and costs and a lien on the cashier's deposits with a further reference ascertaining the amount and the interest thereon and as to whether dividends had been declared on his stock since his death are both final decrees so as to support an appeal.

3. *Same; Final Decree.*—In a strictly technical sense the final decree of a court of chancery is the decree of the court finally and conclusively determining all the matters in controversy disposing entirely of the case and leaving nothing for the court to do; under the statute relating to appeals however the test of finality to support an appeal is not whether the cause remains in some respect in the court awaiting further proceedings or orders necessary to entitle the parties to the full measure of relief or right it has been declared they have or are entitled, but whether or not the decree ascertains and declares these rights, and a decree is final and will support an appeal if they are ascertained and adjudged.

4. *Same.*—There may be two or more decrees in a suit each of which is final for the purpose of an appeal.

5. *Same; Review; Interlocutory Decree.*—If a decree be final and an appeal therefrom be taken more than a year thereafter interlocutory decrees preceding it could be reviewed, but they may be reviewed on an appeal from a succeeding decree if taken within a year whether such succeeding decree be final or interlocutory.

6. *Same.*—Although the time authorized for taking an appeal from an interlocutory decree is thirty days, these decrees may be reviewed notwithstanding the appeal therefrom is taken more than thirty days thereafter if the appeal is from a final decree and is taken within the time allowed for reviewing final decree.

7. *Same; One Appeal From Several Decrees.*—One appeal from several decrees is unauthorized.

8. *Same; Waiver of Irregularity.*—Where no motion is made before submission to correct the irregularity of one appeal from several decrees but the cause was argued and submitted without objection, it was a waiver of irregularity and the cause would be considered as if the appeal was properly submitted, since the matter does not go to the jurisdiction of the court, but only to the manner of the appeal.

9. *Same; Waiver of; Time.*—The time in which an appeal must be taken is jurisdictional and cannot be waived.

10. *Dismissal of Appeal; Defect in Mode or Manner of Taking.*—The courts do not favor the dismissal of an appeal for mere defects in the mode or manner of taking, and will not dismiss them if the defect could and would have been remedied if raised in time.

11. *Same; Review; Reservation of Question.*—Where the decree rendered by the chancellor as to certain items or amounts would be wholly without support in the evidence if the illegal and incompetent evidence excepted to had been excluded or had not been considered, the respondent should have renewed his objection and moved to exclude such evidence when offered before the register in stating the account on a reference and had his rulings thereon, and reserved his exceptions thereto so that the chancellor could review them on the confirmation of the register's report if it was the desire that such rulings be reviewed by the Supreme Court.

12. *Executors and Administrators; Actions Against; Pleading.*—The bringing of a suit against an administrator or executor is tantamount to the presentation of a claim as required by the statute of nonclaim, but to be so the suit should give the information that the filing of the claim under the statute would give, and hence, the complaint or bill must specify the particular claims or damages sought to be charged and must convey definite information to the personal representative, and its allegations must be as certain and specific as the claim or statement thereof must be; and a general averment which may include one or several or many or all, and which no more describes the one than the other is not sufficient.

13. *Corporations; Lien on Stock for Debt; Bill; Allegation.*—A bill to enforce a lien on stock for the debts of the stockholder under section 3476, Code 1907, should particularly describe the debt or liability sought to be secured by the lien, and should aver that it was necessary, for the payment of such debt or satisfaction of such liability to sell the shares of stock on which complainant held the lien, and also a personal demand of payment or satisfaction before foreclosure proceedings, as is required by the statute.

14. *Liens; Statutory; Enforcement in Equity.*—While a lien given by statute which provides a mode of foreclosure or remedy is usually exclusive as to mode or remedy, yet chancery may enforce it when necessary to complete justice between the parties, or when there is special cause for chancery interposition, and its enforcement is incidental and necessary to the enforcement of other equities in the bill; but in such cases the requisites of the statute for enforcement must be complied with so far as possible.

[Wynn, as Administrator v. Tallapoosa County Bank.]

15. *Pleadings; Allegation on Information and Belief.*—An allegation in a bill made on information and belief that the cashier was guilty of other defaults of like character as those set forth which had not yet developed or been brought sufficiently· to light to make more specific charges or statements in relation thereto, is too general to support a claim for damages or for an accounting sought against an administrator.

16. *Actions; Nature and Form; Cumulative or Exclusive Remedy.*— Where a statute in conferring a right which did not exist before does not designate the court or tribunal for its enforcement the remedy is cumulative and not exclusive, but where a statute provides a specific remedy which did not exist before and limits it to a particular tribunal, the remedy provided must necessarily be pursued, since the right to jurisdiction and the remedy is alone conferred by statute.

17. *Same; Meaning of Actio.*—The Latin word, "actio" as used in the civil law means both the proceedings to enforce the right and the right itself.

18. *Same; Definition of Word.*—The word "action" is a civil proceeding taken in a court of law to enforce a right; the form of a suit given by law for the recovery of that which is one's due; the lawful demand of one's right; the means by which men litigate with each other; the act of three parties, the plaintiff, defendant and court; the demand for or the presentation of one's rights in a court of justice; and the judicial means of enforcing the right.

19. *Constitutional Law; Judicial Powers; Encroachment of Legislature.*—Whether a statute should or should not provide for the survival of causes of action as well as of the action is a question of policy which is exclusively for the legislature to determine.

20. *Equity; Jurisdiction; Damages.*—Equity has no jurisdiction of purely common law actions for damages and cannot enforce them merely because it has jurisdiction. for an accounting and by this means enforce demand which a court of law could enforce.

21. *Witnesses; Competency; Transaction With Deceased.*—In an action against the administrator of a deceased cashier for an accounting and other relief, the stockholders of a bank are incompetent to testify as to transactions and conversations with the cashier before his decease.

22. *Banks and Banking; Accounting by Cashier; Nature of Right.*— In so far as a bill in equity by a bank against an administrator of its deceased cashier seeks an accounting against the agent it contains equity.

23. *Same; Bill Against Administrator.*—Where a bill by a bank against an administrator of its deceased cashier for an accounting averred various claims and demands extending over more than seven years, but failed to inform the court or the respondent as to the time the liability accrued, except that it was within such period, and as to many transactions there was no other description of the liability or demand than that it was for allowing an overdraft of for taking insufficient security for a loan, or for making a loan in violation of the by-laws, or without consulting the board of directors, the description of the various claims and demands was not sufficiently specific.

[Wynn, as Administrator v. Tallapoosa County Bank.]

24. *Same; Lien on Stock; Enforcement in Equity.*—A bill filed by a bank against the administrator of its cashier for an accounting and as incidental thereto to declare and enforce a lien against the stock of respondent's intestate under section 3476, Code 1907, contains equity.

25. *Same; Lien or Claim on Deposit; Enforcement in Equity.*—A lien or claim which the bank has on a deposit cannot be enforced in equity against a depositor, although in a proper case- it may be declared or recognized.

26. *Same; Lien.*—A general deposit is the property of the bank itself, and hence, the word lien is inaptly applied thereto, but the word may be properly applied to special specific deposits of chattels, choses in actions, valuables, etc.

27. *Same; Lien on General Deposit.*—As a general rule a bank has a right to set off as for the balance of the depositor's general account, a general deposit, and so long as that is in his favor its lien or right thereon has neither existence nor validity; but the moment an advance or loan is made to the depositor in the form of an overdraft, a discount, acceptance, etc., the lien or right is born and may be applied by the bank alone to the payment of such indebtedness until fully discharged.

28. *Same; Liability to Banks; Officer; Official Duty.*—A cashier is responsible to his bank for all losses suffered directly from his failure in any respect in his official duty, and it does not avail that the directors ordered or authorized him to so act, if they had no authority so to do, as they could not do the act themselves which they authorized him to do, and he knew or ought to have known the act done or authorized was unlawful.

29. *Same; Acts Authorized by Director.*—A bank can act only through its officers or agents, and if directors themselves can do an act so far as they or the bank is concerned, they can authorize the cashier to do it, and if he acts under their lawful authority he is not liable to them or to the bank.

30. *Same; Errors or Improper Acts of Subordinates.*—A cashier is not liable for the errors or improper acts of his subordinates, and to render him liable.for such he must have contributed in some way to their wrong.

31. *Same; Duty to Examine.*—A cashier need not examine and supervise every act of his subordinates, and as to the same need only to exercise such care and diligence as an ordinarily prudent man would exercise in his own business affairs.

32. *Same; Cashier; Nature of Position.*—Strictly speaking, a cashier is not a trustee, and though in his dealings with the public as the agent of the bank, he is held like a trustee, yet if he wrongfully acquires its funds and invests them in his own name, they cannot fasten a trust or lien on the property as in the case of a trustee, since the acquisition of the fund is wrong in such case, and the trust does not exist.

33. *Same; Accounting in Equity.*—While a cashier is liable to account to the bank in equity it is only for losses occasioned by his lack of or failure to exercise reasonable care and diligence, and not for losses the result of errors of judgment.

[Wynn, as Administrator v. Tallapoosa County Bank.]

34. *Same; Overdraft.*—The cashier is not absolutely liable for an overdraft, if it was really a loan on sufficient security.

35. *Same; Negligence of Graud.*—A cashier is liable for losses, the result of negligence or fraud. but not for his dereliction or fault where no loss is the consequence thereof.

36. *Same; Discounts and Loans.*—Where the directors place on the cashier the duty of carrying on the bank's business, and they as a body, or the committees thereof, fail to meet or to instruct, help or supervise them, thus putting on him the whole burden, they cannot hold him responsible to them or the bank for not consulting with them as to discounts and loans as required by the by-laws.

37. *Same; Evidence; Ratification.*—The evidence in this case stated and held to show ratification by a bank and its directors of the acts of its cashier in making loans and discounts and allowing overdrafts in violation of its by-laws.

38. *Same; Ratification.*—The directors can ratify whatever act of the cashier they can do in the first instance, and they will be held to have ratified his acts where they impose on him a duty which they should perform and fail to object to his course of business when they know or could easily discover all the facts.

39. *Same; Allowance of Overdraft.*—Bank directors may allow overdrafts and they can authorize the cashier to do so.

40. *Same; Liability of Cashier; Performance of Duty of Directors.* Directors cannot by neglecting their duty and imposing all on the cashier make him an absolute insurer of the bank against all loss merely because, to carry on its business successfully, he must ignore or fail to observe the by-laws or fail to confer with them.

41. *Same; Overdrafts; Loans or Discounts.*—Where the whole duty and responsibility as to a bank's business is intentionally or negligently imposed on the cashier, he would be liable to the bank for improper loans, discounts or overdrafts where he fails to make reasonable inquiry into the financial standing of those making the same or knowingly or negligently fails to take the proper security, but he is not an insurer against loss in such cases, and is not liable merely because he did not observe the by-laws, unless negligent or inexcusable in not doing so.

42. *Same; Entering Notes as Bills Receivable.*—The mere fact that notes taken by the cashier are entered on the books as bills receivable, is not sufficient to render him liable for not accounting for the proceeds where there is no proof that they were ever paid.

43. *Same; Acts of Cashier; Presumption as to Authority and Ratification.*—Stockholders, directors, committees and officers of the bank must be presumed to have known of and consented to a cashier's course of business as to overdrafts, loans and discounts continued for a period of seven years without suspicion or complaint, and after allowing it for that time and profiting thereby they must be presumed to have ratified his acts.

44. *Equity; Accounting; Variance.*—Where it was alleged that a great number of loans, discounts and overdrafts were made or allowed by the cashier to certain parties named without fixing any dates or otherwise identifying them and the proof showed loss of dis-

[Wynn, as Administrator v. Tallapoosa County Bank.]

counts, overdrafts, etc., of different amounts, and several times for different parties and in a number of instances the wrongful act alleged was the making of the loan to a certain person, and the taking of notes therefor without sufficient security, and the proof showed that the transactions alleged were not a loan but the closing up of a previous indebtedness of such person to the bank by notes and security, or making a past due and existing indebtedness more secure by taking notes and collateral security and extending the time of payment, the variances were material, although a mere difference in the amount in any transaction would not be if it were shown to be the same transaction.

45. *Same; Overdraft.*—Where a cashier allows numerous overdrafts to accumulate and afterwards closes up the transactions by taking secured notes therefor, the wrong for which he is liable to the bank, if any, was in the original transaction, and not in taking the notes which could not of itself injure the bank.

46. *Same; Evidence.*—The evidence in this case stated and examined and held to show conclusively that the loss to the bank on account of overdrafts allowed by the deceased cashier was the fault of the bank or its officers after his death.

47. *Abatement and Revivor; Survival of Cause of Action; Torts of Decedent.*—A bill by the bank against the administrator of a deceased cashier contains equity in so far as it seeks an accounting as to its funds or property acquired by the intestate as its agent or trustee, whether by breach of a contract express or implied, or whether by breach of duty or trust growing out of such contractual relations although amounting to a tort; but is without equity in so far as it seeks to recover of respondent or to fix a liability on the estate of his intestate as for damages founded solely on tort of the latter and in consequence of which his estate was not benefited and as to which an action of assumpsit or accounting would not lie if alive.

48. *Same.*—In the absence of a statute the estate or property of decedent cannot be held liable for the torts or wrongs which are buried with decedents' body, and there being no such statute in this state, providing for the survival of such causes of action, actions therefor do not lie againts a personal representative.

49. *Same.*—At common law not only the cause of action but the action itself dies with the person of the perpetrator of a tort or a wrong.

50. *Same; Statute; Effect.*—Section 2496, Code 1907, does not include causes of actions or rights of action.

51. *Same; Construction.*—Statutes intended to aid the survival of action are remedial and are liberally construed but statutes in aid of a survival of causes of action are in derrogation of the common law, and are strictly construed.

52. *Same; Actions Dying With Persons; Application to Equity.*— The maxim "actio personalis moritur cum persona" does not as a rule apply to cases of which courts of equity take cognizance.

53. *Same; Statutes as to Actions at Law; Application to Equity.*— Statutes providing for the survival of actions at law are not as a rule applicable to equity.

[Wynn, as Administrator v. Tallapoosa County Bank.]

54. *Same; Causes of Action Surviving; Enforcement in Equity.*— Demands and liabilities for which a bank cashier could have been charged on an accounting between him and the bank, or for which assumpsit will lie, survive and are recoverable in a suit in equity against his administrator for an accounting, but those for which he would be liable only in case, or which are purely as for torts for a neglect to perform some personal or official duty to the bank, for which he acquired no benefit or profit, and for which he could be held liable only in an action for tort, do not survive and cannot be enforced against his estate in a court of law or equity.

(Sayre, J., dissents in part.)

APPEAL from Tallapoosa Chancery Court.

Heard before Hon. W. W. WHITESIDE.

Bill by the Tallapoosa County Bank against W. W. Wynn, administrator, d. b. n. of F. A. Vaughan, the deceased cashier of said bank for an accounting and to fix and enforce a lien upon the stock owned by his decedent, and upon a deposit left by his decedent, and for other reasons. Decree for complainants and respondents appeal. Reversed and remanded.

JAMES W. STROTHER and R. B. BARNES, for appellant. No brief reached the Reporter.

LACKEY & BRIDGES, J. M. CHILTON, and J. PERCY OLIVER, for appellee.

MAYFIELD, J.—Appellee filed this bill against the administratrix of the deceased cashier. Pending the suit she died, and the suit was revived and proceeded against appellant as administrator de bonis non.

The bill in the most general terms alleged that intestate was a stockholder, holding 140 shares of its stock; that for several months prior to his election as cashier, which occurred in the year 1895, he by some means or contract with the former cashier, Wright, unknown to complainant bank, acted as its cashier—that is, during this time he was its cashier de facto but not de jure;

that early in that year he was duly elected cashier, and was re-elected annually to such place, and continued so to act, from that time uninterruptedly till his death, which occurred in July, 1902; that during this time (without specifying any dates or any amounts other than the estimate in gross) he made numerous loans of the funds of the bank, without authority and in violation of the by-laws of the bank, and in violation of his duty as cashier, amounting in the aggregate to more than $14,000; that he permitted overdrafts, during this time, amounting to more than $1,700, and that said overdrafts and loans were never paid to complainant; that at his death he was short in his cash account with the bank in the sum of more than $1,500, and was short in his account with bills receivable in the sum of more than $3,700. Demurrers being sustained to the original bill, because of the generality of its averments, it was amended by making more specific the averments as to some of the items claimed in the original bill It was also shown that the intestate cashier was not only a large stockholder in the bank, but that he was also a large depositor therein; and that complainant paid some checks to his administrator, drawn against this deposit, after his death—the amount of which is not stated—but finally declined to pay any more until a settlement of the defaults of intestate, leaving $4,902.77 to the credit of the account. The personal representative having brought suit in a court of law for the balance of the deposit, the complainant, by a petition filed in connection with its bill pending this litigation, had this action in the law court enjoined pending this suit. The bill in a way offered to deliver to the personal representative some of the notes, mortgages, etc., alleged to have been taken without authority and in violation of the by-laws and of his duty as cashier, and to transfer same. The com-

plaint also seeks to recover attorneys' and solicitors' fees in bringing this suit, and in defending the claims of the bank to certain collaterals in bankruptcy proceedings against one Banks, a customer of the bank, who had deposited the collaterals, accepted and taken by the intestate cashier; and also to charge his estate as to attorneys' fees and costs of suit paid by the cashier, during his administration, which were claimed to be unauthorized and unwarranted. In short, the complaint seeks to make the cashier or his estate liable for many financial losses the bank sustained during his seven years' administration. True, each one is, in general terms, alleged to be on account of his negligence or failure to perform his duty as cashier.

It conclusively appears from the bill, answer, and evidence that he had the entire and complete control of all the affairs of the bank during these seven years; the directors and stockholders seem to have had implicit and unlimited confidence in his ability and integrity; notwithstanding the by-laws required the cashier to make a bond in a large sum, to secure the faithful performance of his duties as such officer, none was required of him; and notwithstanding the by-laws provided for a discount board of three directors, who, with the cashier, were to pass upon all loans of more than $250, and such board was appointed, he was always one of the members of that board, as well as the cashier, and the other members are shown to have intrusted the entire matters of passing upon loans and securities to him, never paying the least attention thereto unless called upon by him. No complaint appears to have ever been made by the board of directors or by the stockholders, as a body or individually, during his lifetime, and his continuous, sole and exclusive management of the affairs of the bank for seven years. Neither the president nor the

vice president of the bank seems to have paid the least attention to its management during these seven years, as requested so to do by the cashier. The only further supervision that they or the directors or the stockholders seem to have exercised, during these seven years, was to annually (and sometimes oftener) hold meetings and authorize the cashier to make a loan of money to the bank, but never by it, and to declare a dividend, annually, of 10 per cent. Occasionally they would authorize the sale or purchase of real property, by or for the bank, change the by-laws, or elect officers. But in no instance do they appear of record to have authorized a loan by the bank, to have approved or disapproved of any loan made by the cashier, to have security to be taken, or to have disapproved of that taken by the cashier. The bill seeks an accounting, to foreclose a lien on the stock of its deceased cashier, and also upon his deposit in the bank. The respondent answered the amended bill, denying in full all of its equities, incorporated demurrers in the answer, and set up several defenses specially by pleas. These defenses set up that the by-laws were habitually and entirely ignored and disregarded by the directors of the bank and all officers of the bank; that everything done by the cashier was done with the full knowledge, consent, and ratification of the board of directors, and that the bank is therefore estopped to deny his authority to do what he is alleged to have done; that the claims or demands sought to be enforced are barred by the statute of limitations and of nonclaim; that the demands sought to be enforced in this suit are alleged to grow out of torts committed by intestate during his lifetime; and that the causes of action did not survive his death, and are not claims or demands enforceable against his estate in a court of law or

equity. The chancellor overruled the demurrers to the amended bill, and held the special pleas insufficient; and the cause being submitted on all the pleadings and much proof by both parties, the chancellor decreed the complainant to be entitled to the relief prayed, and referred the matter to the register to ascertain and report the amount due the complainant from the respondent upon each of the items claimed and set forth in the bill; and declared a lien in favor of the complainant on the capital stock standing in the name of the intestate, and upon his individual deposit for the payment of whatever amount complainant might be entitled to recover on account of the matters and things set forth in the bill. The register, on said reference, ascertained and reported the amount due from respondent to complainant, upon the various demands, to be, in the aggregate, $21,014.43. This amount was slightly reduced by the chancellor, by reason of a mistake in arithmetic, to $20,347.71, and thus corrected was affirmed; and a decree was rendered against the respondent for that amount, and a lien declared upon 147 shares of stock and upon the deposit, and a further reference ordered, to ascertain the amount of the deposit and interest thereon and whether dividends had been declared on the stock since the death of intestate. From this decree and all others, respondent appeals, and assigns numerous errors, many of which (but only a small part of those assigned) will be here considered.

The first question to be disposed of, however, is not one of those assigned, but is discussed only by appellee in its brief. It is as to whether or not this appeal can be entertained. No motion was made to dismiss the appeal. The case was argued and submitted without objection, but in a subsequent brief it is insisted that there are jurisdictional questions involved, which cannot be

waived. It is therein insisted that many of the interlocutory decrees appealed from were rendered many months before, and some many years before, the appeal was taken. And it insisted that the last decree is not a final one—one which will support an appeal within a year. If the record showed that there was no final decree rendered within a year before the appeal was taken, this appeal could not be entertained, even by consent; but the record shows a decree which is final in such sense as to support an appeal. The decree of April 5, 1907, confirming the report of the register and the former decree, and decreeing "that complainant have and recover of the respondent, W. H. Wynn, as administrator de bonis non, the said sum of $20,347.71, together with the costs which have not been heretofore otherwise taxed." These decrees are both final, in such sense as to support this appeal. The fact that a further reference was directed, to fix the amounts, does not affect their finality in so far as it is necessary to support an appeal. The exact question has been time and again passed upon by this court, in each case decrees, almost identical in principle with those here particularly considered, being held final.

Brickell, C. J., in the case of *Ex parte Elyton Land Co.*, 104 Ala. 91, 15 South. 940, has expressed the rule and declared the law applicable to this question more clearly than the writer could hope to do. It is there so declared as follows: "Taken in a strict, technical sense, the final decree of a court of chancery is the sentence of the court, finally and conclusively determining all the matters in controversy, disposing entirely of the cause, leaving nothing further for the court to do. Such is not the meaning of the term 'final decree,' as it is employed in the statute. The test of finality of a decree to support an appeal is not whether the cause remains in

fieri, in some respects, in the court of chancery, await-
ing further proceedings, necessary to entitle the parties
to the full measure of the rights it has been declared
they have; but whether the decree which has been ren-
dered ascertains and declares these rights—if these are
ascertained and adjudged, the decree is final and will
support an appeal.—1 Brick. Dig. 89, §§ 85-87; *Jones v.
Wilson,* 54 Ala. 50; *Malone v. Marriott,* 64 Ala. 486;
*Walker v. Crawford,* 70 Ala. 567; *Randle v. Boyd,* 73
Ala. 282; *Cochran v. Miller,* 74 Ala. 50; *Adams v. Sayre,*
76 Ala. 509. We repeat, the decree before us finally and
conclusively ascertains and adjudges the existence of
every material fact upon which the right of the com-
plainant to the relief sought depends."

McClellan, J., in the case of *Garry et al. v. Jenkins,*
109 Ala. 475, 20 South. 8, 9, in speaking of a decree ex-
actly like the one now under consideration, adopts the
expressions of Chief Justice Brickell and uses the fol-
lowing language and cites the following authorities:
"All that remained to be done was a reference to the reg-
ister to ascertain the amounts of the debts of the com-
plainants, and the existence of their debts being con-
fessed, and the creditors coming in under the bill, and
of the precise amount of Drennen's liability as trustees
in invitum of the proceeds of the property sold by him,
and the making of orders and decrees necessary to the
collection of such amount and its distribution among the
creditors, a mere matter of accounting and settling the
amounts to be paid and received under the decree of
June 29th, whereby the creditors' right to demand and
receive, and Drennen's liability and duty to account and
pay, were fully and finally adjudged and decreed. Un-
der all the authorities this was a final decree. It is
clearly within the definition laid down in Brickell's
Digest, as the result of all the cases up to that time, of

a decree upon which an appeal may be taken as from a final decree: 'When a decree is final upon the merits —adjudging the equities and settling the rights of the parties—an appeal will lie under the statutes. If the decree possesses these properties, it is immaterial, so far as affects the right of appeal, that the cause is still in progress, awaiting further proceedings necessary to entitle the successful party to the possession and enjoyment of the rights adjudged to him.'—3 Brick. Dig. p. 34, § 12, citing *Jones v. Wilson,* 54 Ala. 50; *Smith v. Coleman,* 59 Ala. 260; *Hastie v. Aiken,* 67 Ala. 313; *Walker v. Crawford,* 70 Ala. 567; *Randle v. Boyd,* 73 Ala. 283; *Cochran v. Miller,* 74 Ala. 50; *May v. Green,* 75 Ala. 162; and *Adams v. Sayre,* 76 Ala. 509; and to these may be added *Voltz v. Voltz,* 75 Ala. 555; *Marshall, Davis & Co. v. McPhillips,* 79 Ala. 145; *Morton & Bliss v. N. O. & S. Ry. Co.,* 79 Ala. 590, 612; *Stoudenmire v. De Bardelaben,* 85 Ala. 85 (4 South. 723) ; *Louisville Manufacturing Co. v. Brown,* 101 Ala. 273 (13 South. 15) ; *Foley v. Leva,* 101 Ala. 395 (13 South. 747; *Ex parte Elyton Land Co.,* 104 Ala. 88 (15 South. 939)."

The decree of April 23, 1906, being rendered within a year, it may be reviewed on this appeal whether final or interlocutory. If final, it was appealed from, as well as the one of Apirl 5, 1907, within the year; if interlocutory only, it may be reviewed on the appeal from the final decree. There may be two or more decrees in one suit, each of which is final for the purposes of appeal. If the decree of April 23, 1906, be a final decree, and the appeal in this case had been taken more than a year thereafter, there would be a serious question involved in this case, and under the decisions of the last case quoted from, the interlocutory decrees preceding it could not be reviewed on this appeal, for the reason that no ap-

peal would lie from such final decree, and as all the interlocutory decrees preceding it would relate to it, and not to another and subsequent and final decree from which the appeal was taken, they could not be reviewed. But it was within a year of the taking of the appeal, and was appealed from, hence it and the interlocutory decrees may be reviewed on this appeal, whether it be final or interlocutory. Though no appeal is taken from interlocutory decrees within 30 days, the time authorized, they may be reviewed on an appeal taken from the final decree within a year, though the appeal is taken more than 30 days, or even a year, after the rendition of the interlocutory decrees.—*Nelms v. McGraw*, 93 Ala. 245, 9 South. 719; *Wadsworth v. Goree*, 96 Ala. 227, 10 South. 848.

The appeal in this case is anamalous, in that seven or eight decrees are appealed from on this one appeal, and so certified to this court. This is not authorized, and is an irregularity which should have been corrected on motion, before the submission, but no such motion was made—the case was argued and submitted without objection; and it not going to the jurisdiction, but only to the mode or manner of appeal, the irregularity was thus waived by the submission, argument, and joinder in errors as if the appeal had been properly taken.—*Kelly v. Deegan*, 111 Ala. 156, 20 South. 378.

The mode, but not the time of taking an appeal may be waived; the one is jurisdictional, the other not. Amendable defects will be considered as waived, unless raised before the submission. This court does not favor the dismissal of appeals for defects in the mode or manner of taking them, if the defect could and would have been amended if raised in time.—*Kidd v. Turner*, 52 Ala. 251; *Thompson v. Campbell*, 52 Ala. 583; *Coffey v. Norwood*, 81 Ala. 512, 8 South. 199; *Vaughan v.*

*Higgins,* 68 Ala. 546; *Alexander v. Rea,* 50 Ala. 64. The bill, in so far as it seeks an accounting by the principal against the agent, contains equity. The averments in this respect, however, should have been more specific. The bill was not intended, and does not purport to be, one for discovery or for relief in the nature thereof. No discovery is sought, and none could be had, so far as the averments or the proof shows.

The bill, however, was entirely too general in its averments as to the various items, claims, or demands, upon which it is sought to fix liability upon the estate of its deceased cashier. These claims and demands should have been more particularly specified and described than they were, in both the original and amended bills. Very few, if any, were described as fully as they could or should have been described. They covered transactions extending over a period of more than seven years, without any information to the court or to the respondent as to the time the liability accrued, except that it was within this period of seven years. Many transactions were gone into, on the trial, with no other description of the liability or demand than that it was for allowing an overdraft, or for taking insufficient security for a loan, or for making a loan in violation of the by-laws or without consulting the board of directors. The respondent was entitled to a more specific description of the various claims and demands with which he was sought to be charged and was eventually charged. No one could prepare a defense against such general charges, covering thousands of similar transactions extending over a period of seven years.

The evil consequence of such issues is clearly shown in this case. All the affairs of the bank, covering the period of seven years during which the intestate was its cashier, were gone into; and where the bank was found

to have suffered any loss during that time, and the intestate had had any connection with it, he was sought to be charged therewith, and, in most cases, was so charged. Having had, as it conclusively appears from the proof, complete and exclusive charge and control of the affairs of the bank during the period of seven years, he was necessarily connected with nearly every transaction the bank had. As to all those transactions which were successful and proved profitable to the bank, no further inquiry was made; and fortunately for the estate of the deceased cashier and the bank most of the transactions were successful. The business of the bank seems to have done well under his management. It annually declared and paid to its stockholders 10 per cent. dividends. But some of the loans were not well secured, some were not paid, and some of the customers were allowed to overdraw their accounts, and failed to make their overdrafts good; and as to all these his estate was sought to be charged. The books of the bank showed that there was a shortage in the cash, and in bills receivable, but as to when or how these shortages occurred, as to what bills receivable were lost or destroyed, the averments did not show, nor did the proof show. In fact, the proof leaves it doubtful if there was any shortage at all, as to the bills receivable, but tends to show that it was an error of bookkeeping rather than a real shortage. The averments of the bill were entirely too general, as to the claims or demands with which it sought to charge the personal representative, and as to defaults of the intestate for which it sought to hold his estate liable. Had the bill been filed against the cashier, and he was in the possession of the information and the complainant not, and discovery had been sought, then such general averments would be allowable; but no discovery is sought or attempted, and from

the nature of the case none could be had at the suit of complainant. It has all the information at hand or at its command that can be had; it has all the records and written documents that are to be had; its officers and agents have all the information, and respondent none; he must of necessity rely upon the facts and records which complainant produces.

Section 13 of the bill is as follows: "Orator further shows to your honor on information and belief that the said F. A. Vaughan, as orator's cashier was guilty of other defaults of like character as those set forth which have not yet developed or been brought sufficiently to light for orator to make more specific charges or statements in relation thereto." This averment is entirely too general to be the basis for a claim for damages or accounting. No reason appears why complainant did not, at that time, know all the facts it ever could know. The cashier had then been dead nearly a year. Complainant had and possessed all the records, and most all the witnesses were its officers and agents. It should have informed respondent more particularly as to what he or the estate were to be charged with. Would this averment be sufficient itemization or specification or description of a claim with which an estate should or would be charged? If this bill had been filed in the probate office or with the personal representative, would it have been a sufficient presentation or filing of all the claims with which it seeks to charge the estate of the deceased cashier? The statute of nonclaim requires a presentation of claims against an estate within 12 months from the time they accrue, or from the grant of letters of administration. The statutes provide how they shall be presented. The bringing of a suit is not the mode or manner provided by the statute, but this court has decided that the bringing of a suit is tanta-

mount to the presentation prescribed by the statute, though, of course, to be so, the suit must give the information that the filing required by the statute would give.—*Smith v. Fellows,* 58 Ala. 467; *Page v. Bartlett,* 101 Ala. 203, 13 South. 768.

This bill illustrates the rule: It sufficiently informs the respondent of some of the claims, but as to others it does not; as to some it was a sufficient presentation, as to others it was not. A complaint or bill, to answer as a presentation, must describe, specify, or define the particular claims or demands sought to be charged. It must convey definite or certain information to the personal representative. The allegations or averments must surely be as certain and specific as the claim or a statement thereof must be, which is filed. A general averment—a mere omnium gatherium—which may include one or several, or many or all, which no more describes one than another, is not sufficient. The bill contains equity in so far as it seeks to declare and enforce a lien against the stock of respondent's intestate, in favor of complainant; but its averments for this purpose were both insufficient and too general. It was sufficient, to declare the lien, but not to enforce it. For this purpose it should have more particularly described the "debt or liability" which was secured by the lien; and it should have averred all the facts which the statute giving the lien, requires to exist, before there can be a foreclosure, to wit, that it was necessary for the payment of such debt, or the satisfaction of such liability, to sell the shares of stock upon which complainant held the lien, and a personal demand of payment or satisfaction before the proceeding of foreclosure. The statute (Code, § 3476) conferring the lien (without which it does not exist), requires this much, to enforce it, and neither the court nor the corporation can dispense with it.

It is true that the lien is given by the statute which provides a mode of foreclosure, or a remedy; and in such cases the remedy given is usually exclusive, but such lien may be enforced in chancery when necessary to do complete justice between the parties or when there is a special cause for chancery interposition, and the enforcement in equity of such lien is incidental and necessary to the enforcement of such other equities in the suit, but in such cases the requisites of the statute for enforcement must be complied with, in so far as is practicable in a court of equity. The statute in question does not designate or name any court or tribunal in which the lien shall be enforced, in fact, it provides for foreclosure without any suit or action; but even if it did, conferring jurisdiction on one tribunal by statute, does not preclude or deny it to others which, without the statute, possessed it; but the remedy conferred is cumulative and not exclusive. But when a statute both confers a right which did not exist before, and also provides a specific remedy, which did not exist before, for its enforcement, and limits it to a particular tribunal—the right, jurisdiction, and remedy all being conferred solely by statute—the remedy provided must necessarily be pursued. The question is fully discussed, with a review of the authorities, in the case of *Sheffield City Co. v. Tradesman's Bank,* 131 Ala. 185, 32 South. 598.

The bill, in so far as it attempts to have the court declare and enforce a lien against the deposit of the intestate in its bank, is without equity. The lien, claim, or right, whatever it may properly be called, which a bank has upon a deposit in its vaults, as against the depositor—its creditor to that amount—cannot be enforced by a court of equity, though in a proper sense it might be declared or recognized.

The word "lien" is inaptly applied to a general deposit in a bank. It is the property of the bank itself. It can be properly applied to special specific deposits of chattels, choses in action, valuables, etc. As to a general deposit the bank has a right to set-off as for the balance of the general account of the depositor; and of course so long as that balance is in favor of the depositor the lien or right has neither existence nor validity; but the moment any advance or loan by the bank is made to the depositor—in the form of an overdraft, a discount, acceptance, etc.—then the lien or right is born, and may be applied by the bank (and the bank only) to the payment of such indebtedness till it is fully discharged.—Morse on Banks & Banking, §§ 324, 334; *Lehman's Case,* 64 Ala. 567; *Dean v. Allen,* 8 Johns. (N. Y.) 390. The bill does not attempt to charge respondent with any debt or account as to which the bank could apply the deposit. If it did, it could do so without the aid of the court, and in fact the court could not aid it so to do; the most it could do for it, would be to say: It did no wrong in so doing if it showed it had properly so applied the deposit. But this is not here done—the court is asked to do that only which the bank can do. In a proper case the court might declare that a certain claim or demand was one to which it might be applied, but clearly this is not such a case.

It therefore follows that the injunction of the action at law to recover the amount of this deposit was improperly granted. No reason except that of the lien was attempted to be offered, to authorize the issuance of the same; and, this ground being clearly without merit, the right to the injunction did not exist. The bill contains equity in so far as it seeks to charge respondent for an accounting as to the funds or property of the bank, acquired by the intestate as the bank's

agent or trustee, whether by breach of contract, ex-pressed or implied, or whether by breach of duty or trust growing out of such contractual relation, though it amounted to a tort; but it is wholly without equity in so far as it seeks to recover of the respondent, a per-sonal representative, or to fix a liability upon the es-tate of the intestate, as for damages founded solely upon a tort of the intestate, and in consequence of which his estate was not benefited, and as to which an action of assumpsit or of accounting would not lie against intestate if living.

The torts or wrongs of a man, when he dies, are bu-ried with his body, and of course, in this world, he cannot be held liable therefor either civilly or criminal-ly, by statute or otherwise; nor can his estate or prop-erty thereafter be held liable therefor, unless so au-thorized by statute. We have no statute in this state which provides for the survival of such causes of action against the personal representative. We have a few, which either give a new right of action or provide for the survival of a cause of action for the personal rep-resentative. Whether this is a new cause of action giv-en or the survival of an old one, it is not necessary to be now decided. We refer to the homicide statute and the employer's liability act. So the common law, alone, in this state provides for the survival of causes of action against the personal representative, and therefore to it alone we must look, as to which of the many claims and demands sought to be enforced in this suit against a per-sonal representative, survive the death of the intestate.

At common law not only the cause of action, but the action itself died with the person. It was thus ex-pressed in Latin: "Actio personalis moritur cum per-sona."—Broom's Legal Maxims. The Latin word "ac-tio," as used in the civil law, meant both the proceed-

ing to enforce the right and the right itself.—Rapalje's Law Dict. But the English word "action," derived from it, was never given that dual meaning in the English common law, nor in our common law. It is defined by Rapalje as "a civil proceeding taken in a court of law to enforce a right." Coke defines it as "the form of a suit given by law for the recovery of that which is one's due; the lawful demand of one's right" (Co. Litt. 285). Blackstone, as "the means by which men litigate with each other" (3 Black. Com. 116, 117). Bracton, as the act of three parties, the plaintiff, the defendant, and the court.—*People v. Colborne,* 20 How. Prac. (N. Y.) 378, 380. The courts of Tennessee, Mississippi, New York, Pennsylvania, Maine, New Hampshire, and Iowa, and many others, as well as the Supreme Court of the United States, have all practically defined it, like the above authors, as a demand for or a presentation of one's rights in a court of justice.—*Cohens v. Virginia,* 6 Wheat. 264, 5 L. Ed. 257; *Valentine v. City of Boston,* 37 Mass. (20 Pick.) 201; *Peeler v. Morris' Lessee,* 12 Tenn. (4 Yerg.) 331; *Webster v. County Commissioners,* 63 Me. 27; *Badger v. Gilmore,* 37 N. H. 457; *Eaton v. Elliot,* 28 Me. 436; *Zeigler v. Vance,* 3 Iowa, 528; *Porter v. Ritch,* 70 Conn. 235, 39 Atl. 169, 39 L. R. A. 353; *Harger v. Thomas,* 44 Pa. (8 Wright) 128, 84 Am. Dec. 422. The Code of Georgia defines it as: "The judicial means of enforcing a right."—Ga. Code, §§ 4930.

There are a great many more authorities cited in Words & Phrases (volume 1, p. 128 et seq.), to practically the same effect. We only cite these to show that our statute as to the survival of "actions" does not include "causes of actions," or "rights of action." Our statute on the subject is as follows, Code, § 2496: "All actions on contracts, expressed or implied; all personal

actions, except for injuries to the reputation, survive in favor of and against the personal representatives."

Prior to the adoption of the present Code, the words "person" "and" preceded the word "reputation." These words were stricken out of the statute by the code committee which revised the MS. for the last Code. With the exception of this change, the statute as now written has been the only statute on the subject since it was first adopted in 1853, as a part of the Code of 1852. It was codified from previous statutes of the state, of the Alabama territory, and of the Mississippi territory, which formed our statutory law at the time the Code of 1852 was adopted. These statutes were numerous, and all related to the survival, revival, and abatement, of actions and suits, and not to the survival of the "cause of action." They were all statutes relating to the procedure and practice in courts, and not to the rights of parties. These statutes may be found compiled in Clay's Digest, pp. 313, 314, 613, 614, and in Aiken's Dig. pp. 259, 260. That when first codified they were so intended by the code commissioners and the Legislature, is shown by the fact that they were placed under the titles or subjects: Part Third. Proceedings in Civil Cases. title: Proceedings in Civil Actions in Courts of Common Law. Chapter: Of the Parties.

The particular section is one of several (the others being sections 2497, 2498, 2499) adopted at the same time, and must be construed in pari materia as to them. So construed, it is certain that the word "action," as used in the statutes, does not mean or include the phrase "cause of action," because both the word and the phrase are used in the statutes, and unmistakably used to refer to different things, and are in no case used as synonyms. All of these statutes are intended to provide for the sur-

[Wynn, as Administrator v. Tallapoosa County Bank.]

vival of "actions" when the "cause of actions" survives, and for the abatement thereof when the "cause of action" does not survive. See sections 2499, 2500, 2501 of the Code. At one time in England all actions abated on the death of either party thereto. They thereby absolutely perished. English statutes at first provided for the personal representative in certain cases, to come in voluntarily, or be brought in by scire facias.—17 Car. II, c. 8; 8 & 9 Will. III, c. 11; 25 Edw. III, c. 5; 3 & 4 Will, c. 42. These were, however, limited to certain cases in which the causes of action survived. The common law of England as changed by these, and probably other English statutes, form the common law of this state as to the survival of causes of action and also of actions and suits. We have in Alabama, as we have seen, statutes as to the survival of actions, but none as to the survival of causes of action, unless the homicide statute and the employer's liability act are such statutes. It has been held by this court that our statutes as to the survival, revival, and abatement of actions did not apply to cases in which the defendant or any wrongdoer died before action brought; but only to cases in which actions were brought.—*Blakeney v. Blakeney*, 6 Port. 109, 30 Am. Dec. 574; *Nettles v. Barnett*, 8 Port. 181. If the suit in this case had been brought against the intestate, the questions then might be without our statutes, though it is not certain that the statutes in question apply to suits in equity; but certainly they do not provide, or undertake to provide, as to the survival of the cause of actions but only to actions actually brought.

The common law applicable to the case at bar has been well stated by the Supreme Court of the United States in the case of *U. S. v. Daniel*, 6 How. 11, 12 L. Ed. 323, as follows: "No action will lie against an executor for a personal wrong of his testator. * * * If the

person charged has received no benefit to himself at the expense of the suffered, the cause of action is said not to survive; but where, by means of the offense, property is acquired which benefits the testator, then an action shall survive against the executor. And it is laid down in Cowper, 376, with respect to the form, that no action survives, where the plea of the defendant be 'not guitly,' but where the cause survives, some other form must be pursued."

The statutes of many states have been so construed as not to change the rule, though the statutes in such cases provided for the survival of the "cause of action" as well as the action. The Supreme Court of New York, in the case of *Dininny v. Fay,* 38 Barb. 21, speaking of its statutes which provided for the survival of the cause of action as well as the action, says: "It would seem, from the reading of the statute, that the cause of action for the same class of wrongs, precisely, survives alike in favor of the executors and administrators of the injured party, and against the executors and administrators of the wrongdoer. Such is the plain reading of the statute, and I can have no doubt that such was the intention. But the courts have always made a distinction, and held that the cause of action does not survive against the executor or administrator of the wrongdoer, unless his estate was benefited by the wrong.—*People v. Gibbs,* 9 Wend. 29; *Franklin v. Low,* 1 Johns. 396; *Cravath v. Plympton, Adm'r,* 13 Mass. 454."

In the main, it will be seen that the Legislatures have been resurrectionists, as to both dead causes and actions. The courts have aided them as to the "actions," but have retarded them as to "causes." As to the one, the statutes are remedial and are liberally construed; as to the other, they are in derogation of common-law rights, and are strictly construed. As to the one, they willingly believe

in the resurrection, but as to the other they are usually doubting Thomases, and are more inclined to reinter them, as corpses, than to aid in their resurrection. They require convincing proof as to the survival of the "cause" —they will accept no ghost stories. Whether our statutes should or should not provide for the survival of causes as well as of actions, is one conclusively for the Legislature and not for the court. It is our duty and province to expound, interpret, and apply the law of rights as distinguished from rules of procedure and practice, and not to change the law of rights. "Courts should protest alike against judge-made law and judicial interference by the Legislature."

Applying the law as thus construed, to the case in suit, it follows that the bill in this case is without equity in so far as it seeks to charge the administrator or the estate of the intestate cashier, for the torts of intestate, which torts did not inure to the benefit of the intestate or of his estate. If his wrongs complained of —whether he be considered as agent or as trustee—did not result in benefit to him or his estate, though they may have been of detriment to the estate of the complainant, no right of action or suit therefor survived against his personal representative, and even though an action of tort could have been maintained against him during his lifetime. If an action had been brought before his death, it would have survived as to all the claims sought to be enforced in this suit; but as none was brought the cause or the right of action as for mere torts, and for which neither assumpsit nor an accounting would lie, did not survive, and died and was buried with the intestate. Some of the torts alleged in the bill probably resulted in the benefit of the intestate or to his estate; as to these the bill has equity; as to the others it has not. As to the one class the tort could be

waived and assumpsit maintained; this right of action survived, and equity can enforce it. If the only right of action was a tort, it did not survive, and, of course, could not be enforced.

The case of *Banks v. Briggs' Estate,* 70 Vt. 599, 41 Atl. 586, and the cases therein cited, are conclusive as to this question. We cannot agree with counsel for appellee that the indicated case is not authority in this jurisdiction because the statutes of the two states are different. The facts of the two cases are as near alike as could be expected to be found. Some of the demands sought to be enforced in the two cases were identical. The statute of Vermont and our statute are different, but the difference is in favor of the Vermont statute as tending to authorize the suits. It provided for the survival of the causes of action against the personal representative, whereas ours does not. It specifically provided for the survival of trespass on the case; trespass on the case would be the proper action against a cashier in both cases. Our statute only provides generally for certain actions, not mentioning this case as one of these.

Besides the cases already cited, the case of *Rabb v. Patterson,* 42 S. C. 528, 20 S. E. 540, 46 Am. St. Rep. 743, is conclusive. In that case a statute applied or existed, which would come nearer supporting the suit than does our statute, and it was a suit by a cestui que trust against the estate of the trustee as for his torts.

The maxim "actio personalis moritur cum persona" does not as a rule apply to cases of which courts of equity take cognizance, nor do statutes providing for the revival of actions at law apply to courts of equity; that is, they do not control. Courts of equity have their own statutes and rules as to the revival of suits pending therein, though equity may adopt and follow the rules

of procedure made for courts of law only. Equity has no jurisdiction of purely common-law actions for damages, and it cannot enforce them merely because it has jurisdiction for an accounting, and by this means enforce demands which a court of law could not enforce.

Such are a part of the demands sought to be enforced by this bill and decree. Those demands and liabilities for which the intestate could have been charged, on an accounting between him and the bank, or for which an action of assumpsit would lie, survive, and are recoverable in this suit; but as to those for which he would be liable only in case, or which are purely as for torts, for a neglect to perform some personal or official duty to the bank, as to which he acquired no benefit or profit, he could be held liable therefor only in an action of tort. Such causes of action did not survive, and cannot be enforced against his estate in a court of law or equity.— *Banks v. Briggs' Estate,* 70 Vt. 600, 41 Atl. 586, and authorities there cited.

As to the liability of the cashier to the bank, for allowing overdrafts by depositors, for taking improper securities for loans made by the bank, and for failing to conform to the by-laws of the corporation, as to making loans without conferring with the discount board, etc., we think the law different from that which the chancellor seems to have applied to this case. It is true, as contended by counsel for appellee, and as the chancellor seems to have decided, that the cashier of a bank is responsible for all losses it suffers directly from his failure in any respect in his official duty, and that it cannot avail him that he was so ordered or authorized so to act, by the directors, if the directors had no authority to so order or direct him, nor to do the acts themselves which they authorized him to do, and he knows or ought to know that such act done or authorized was un-

[Wynn, as Administrator v. Tallapoosa County Bank.]

lawful. But a bank, like any other corporation, can act only by and through its officers and agents, and if the directors themselves can do an act, so far as they or the bank is concerned, they can authorize the cashier to do it; and if he does it under their authority, he is not liable to them or to the bank, though he might be in some cases liable to the bank for all damages it suffers on account of any wrongful official acts of his, or of any, from any unauthorized assumption of power on his part, or for any, from his failure to obey any proper and valid instruction from his superior officers in the bank. He is not liable, as the directors are, for the errors or improper acts of his subordinate officers such as tellers, bookkeepers, etc., or agents in the bank. He is not liable to the bank as their principal. He must have in some way contributed to the wrong of the subordinate to render him liable. He is not required to examine and supervise their every act; but as to their acts, only to use such care and diligence as an ordinary man would exercise in his own business affairs.

A cashier is not a trustee in the strict sense of the word, though he is a quasi trustee. In his dealings with the public he is the agent of the bank, but as to the bank he is held like a trustee; yet if he wrongfully acquires the funds of the bank, and invests them in his own name, the bank cannot fasten a trust or lien upon the property, as in the case of a real trustee; the acquisition of the funds being wrong in that case, the trust does not exist. However, the official relation to the bank renders him liable to an accounting to the bank only for losses occasioned by his lack of, or failure to exercise, reasonable care and diligence, and not for losses the result of mere errors of judgment. He is not absolutely liable for an overdraft, if the nature of the transaction is such that it is really a loan on sufficient surety.

He is liable for losses the result of negligence or fraud, but not for dereliction or fault when there is no loss in consequence thereof. If the directors place upon him the duty of carrying on the business of the bank, and they as a body, or the committees thereof, fail to hold meetings or to instruct, direct, or help, and supervise him, absenting themselves from the bank and its business and thus putting the whole burden upon the cashier—as is clearly and indisputably shown to have here been the case—neither they nor the bank can hold him responsible for not consulting with them, as required by the by-laws of the bank, as to discounts and loans, though the stockholders might hold him and the directors.

The uniform and long-continued acquiescence of the officers and committees of a bank, in the course of business pursued by the cashier as to his acting alone in making discounts and loans, allowing overdrafts, etc., and their and the bank's long delay in making any claims for damages on account of the pretended violations of the by-laws of the bank, afforded the strongest proof of their and its approval of the practice and course of dealing so adopted and pursued by the cashier, though the rights of the stockholders might be different. The directors of a bank have power to allow overdrafts, and they can authorize the cashier to allow them, and if he allows them without their authority they can ratify them. They can ratify whatever they can do in the first instance; and they will be held to a ratification of his acts where they impose upon him a duty which they should perform, and fail to object to his course of business when they know, or could easily know, all the facts. They cannot, by neglecting to perform any duties, and imposing all on the cashier, make him an absolute insurer of the bank against all losses, merely because, in order to carry on the business of the bank suc-

cessfully, he must ignore or fail to observe the by-laws, or fail to confer with them.

In loans like the ones shown by the record in this case, in which the whole duty and responsibility of carrying on the banking business has been intentionally or negligently imposed upon the cashier, he will be liable to the bank for improper loans, discounts, or overdrafts, where he failed to make reasonable inquiry into the financial standing of those making the overdrafts, loans, or discounts, or knowingly or negligently failed to take proper security. He is not an insurer against loss in such cases, and is not liable merely because he did not conform to the by-laws of the bank, unless negligent or inexcusable in so not conforming. Conduct such as that shown on the part of the directors, officers, and committees, of this bank, is tantamount to an authorization of the cashier to do all things they could and should do, and to a ratification of his conduct for seven years. Of course such conduct or negligence on the part of the other officers, directors, and committees of the bank in the failure to perform their duties, and in leaving and putting it all upon the cashier, would not authorize him to defraud the bank or the officers, but it will exempt from failure to observe the by-laws or to follow instructions which they never gave.—*Pryse v. Bank* (Ky.) 33 S. W. 532; *Bank v. Burt,* 93 N. Y. 246 (48 Sickels); Morse on Banks & Banking, §§ 172, 358; Thompson on Corp. § 4828; *Bank v. Ten Eyck,* 48 N. Y. 305; *Wallace v. Bank,* 89 Tenn. 630, 15 S. W. 448, 24 Am. St. Rep. 625. The mere fact that notes taken by the cashier are entered upon the books of the bank as bills receivable is not alone sufficient to render him liable for not accounting for the proceeds thereof, where there is no proof that the notes were ever paid.—*Kelley v. Foster,* 30 N. Y. St. Rep. 353, 8 N. Y. Supp. 901, 132 N. Y. 546, 30 N. E. 370.

There was not sufficient evidence in this case to charge the administrator as for shortage in bills receivable; it rather showed errors in the bookkeeping, for which the cashier was not liable, than a loss of bills receivable. The proof showed that the cashier made many loans and discounts, and allowed overdrafts, without conferring with the board of directors or with the committees, or with other officers of the bank, as was provided by the by-laws of the bank; but in most cases, if not in all, the proof shows that he was justified and authorized by the conduct of such officers, directors, and committees in doing as he did, or that his acts were ratified by the parties and powers which could have authorized them in the first instance.

The proof shows that there was never a breath of suspicion or of complaint against the actions or conduct of the cashier, or his mode of conducting the business, by any individual or body of men or officers, during his seven years of management. There was no proof of any change, in the course of the business during those seven years, or that his course of management of the affairs of the bank was different from that of his predecessor. The stockholders, directors, committees, and others, must be presumed to have known of and consented to it; and in allowing it for seven years, profiting by it—receiving the results and profits during all this time without a whisper of complaint or offer to change it—they must be presumed to have ratified. There is not a particle of evidence to show anything approaching criminality on the part of the cashier, and nothing tending to show actual fraud on his part; in fact, the bill disclaims any such charge. All that the proof shows or tends to show, as to fraud—if such it could be called—was constructive fraud as distinguished from active or intentional fraud.

There appear many material variances between the allegations and the proof. The allegations were that a great number of loans, discounts, and overdrafts, were made or allowed by the cashier, to certain parties named, for certain amounts, without fixing any dates or otherwise identifying them; while the proof showed losses, discounts, overdrafts, etc., of different amounts and several times to different parties. Of course a mere difference in the amount, if shown to be the same transaction, loan, discount, or overdraft, would not be a material variance, but it could not be known from this proof that it was the transaction alleged. The reasonable presumption is that they referred in many instances to different transactions, which of course could not be allowed.

In a number of instances the wrongful act alleged was the making of a loan to a certain person, and the taking of notes therefor without sufficient security; while the proof shows that the transaction alleged was not a loan, but was the closing up of a previous indebtedness of such person to the bank, by notes and security—that is, the transaction was the making of a past due and existing indebtedness more secure by extending the time of payment, and taking notes and collateral security therefor. The transaction as alleged, therefore, was not only different from that proven, but the one alleged was wrongful, while the one proven was not wrongful, but proper under the conditions. This is true, as to the largest item proven against the administrator—the one to R. D. Banks. The bill alleges loans to R. D. Banks of $2,662.50, and $2,360.71, without the taking of security as provided by the by-laws, while the proof shows that these amounts were not loans made at the time, but grew out of overdrafts that had been accumulating from time to time theretofore. The wrong, if any, on the part of the cashier, was in allowing each, or at least some of

these numerous overdrafts to accumulate—that is, it was in paying the checks and drafts of said Banks, at various times before, which aggregated this amount; these original transactions occasioned the losses complained of, and as to these he should have been called upon to defend. The act as proven, of closing up this amount by notes and collateral security to the amount of nearly $10,000, certainly could not, of itself, result in injury to the bank, nor did it in fact so result. The loss resulting as to this debtor, and from his failure to pay this note, is conclusively shown to have been the fault of the bank, or of its officers, after the death of intestate. Abundant collateral was taken by the intestate to secure these notes; and after his death the bank, instead of collecting these collateral notes, and applying the proceeds to the payment of the notes, actually delivered these collaterals to the depositor to collect, and he collected some of them and deposited the money in complainant's bank to his own credit, he having in that bank, at the time or soon after these notes matured, a deposit ample to pay them in full.

If the act of the deceased cashier can be said to have been negligent, in taking these notes, bearing interest, from a customer who had deposits in the bank at times to the amount of $10,000, said notes being secured by collaterals to the amount of $8,000 or $10,000, what must be said of the act of the bank and its living cashier, in delivering this very collateral taken by the dead cashier as security, to the depositor to collect, and failing to apply his deposits in the bank to the payment of these notes when due, which they had a right to do, and which was their duty to do so far as the liability of the dead cashier was concerned? If loss resulted, it is conclusively shown not to have been from the act of the

dead cashier, but from that of the bank itself, or from that of its officers.

The stockholders of the bank were clearly not competent to testify as to the transactions had with the deceased cashier, and should not have been allowed to so testify, over the respondent's objections. Such evidence should not have been considered by the chancellor or register; the chancellor did not pass upon any of the objections to the testimony, but recites, in the decree that he considered only the legal testimony—so it appears that he did not consider such testimony. It does not appear whether the register considered it or not. However this may be, the decree rendered by the chancellor as to some of the matters in which complainant was entitled to relief and confirmatory of the report of the register as to these items and amount, were wholly without support in the evidence, if the illegal and incompetent evidence objected to had been excluded or had not been considered. The respondent should have renewed his objections to, and motions to exclude this evidence, when offered before the register when he was stating the account, and had a ruling thereon by the register and have reserved his exceptions, thereto, so that the chancellor could review them on the confirmation. The chancellor's rulings thereon could then have been reviewed by this court. For these reasons, we cannot review the objections and exceptions seriatim.

It follows that the decrees of the chancellor must be reversed and the cause remanded.

We are unable to here render the decree which the chancellor should have rendered, for the reason that from this record it appears that the complainant is entitled to some of the relief granted. But the case being tried on improper issues, and there being a material va-

·riance between the allegations and the proof, we are
wholly unable to render the proper decree in this court
in the present state of the pleadings and proof.

Reversed and remanded.

SIMPSON, ANDERSON, and EVANS, JJ., concur. SAYRE,
.J., dissents in part.