## Boyd *et al. v.* Applewhite *et al.*

### [In Banc No. 20630.]

1. BANKS AND BANKING. *Directors and majority stockholders permitting excessive loans to directors are liable to minority stockholders for loss of their stock.*

   The directors of a bank who own a majority of the capital stock and who permit improvident and excessive loans to be made by the bank's officers to the individual directors themselves, causing the bank to become insolvent and go into the hands of a receiver and the capital stock to become worthless, are liable in damages to the minority stockholders for the loss of their stock.

2. BANKS AND BANKING. *Directors not examining books and securities to determine bank's condition do not exercise ordinary care.*

   The directors of a bank who never make or cause to be made an examination of the books and securities of the bank to determine its condition and the way it is being conducted do not exercise ordinary care and prudence in the management of the bank's affairs.

3. BANKS AND BANKING. *Directors whose negligent supervision renders minority stock valueless cannot plead ignorance.*

   Directors of a bank who negligently fail to exercise reasonable control and supervision of the bank's officers cannot, as against the claims of innocent stockholders whose stock has been rendered worthless by such negligence, plead ignorance of that which by proper diligence and inquiry the directors ought to know.

4. BANKS AND BANKING. *Evidence held to sustain chancellor's decree for minority stockholders against directors permitting excessive loans.*

   In a suit in equity by stockholders against the directors to recover losses sustained through neglect of duty, misconduct, and negligence of the directors causing the bank to become insolvent and the capital stock valueless, the findings of fact by the chancellor and his decree in complainant's favor cannot be said to be clearly wrong, where there is testimony tending strongly to prove that the paid-in capital stock of the bank was one hundred thousand dollars and that the directors by inattention, by failure to enact by-laws governing the officers, by

failure to examine the books, papers, and securities of the bank, negligently permitted the president and cashier to lend the individual members of the board of directors the aggregate sum of two hundred and twenty-nine thousand dollars, a part of which is evidenced by large overdrafts, as a result of which the institution was wrecked and the capital stock rendered worthless.

5. Jury. *Statute making negligence and contributory negligence jury questions has no application in equity case.*
   Chapter 135, Laws of 1910 (section 503, Hemingway's Code), providing "all questions of negligence and contributory negligence shall be for the jury to determine," has no controling application in an equity case.

6. Banks and Banking. *In suit by minority stockholders against directors for losses resulting from their negligence directors cannot plead invalidity of charter.*
   Where it is shown incorporators apply for and obtain a charter incorporating a bank under a law that is valid, issue stock in due course, elect officers and a board of directors, and actually conduct business in the corporate name, the chosen directors, who accept the position and assume to discharge the duties of their office, cannot in a suit in equity against them by minority stockholders plead that because the charter of the bank is invalid they are not directors of a corporation.

7. Banks and Banking. *Liability of directors for negligence is tortious, so that they may be sued jointly or severally.*
   The liability of bank directors for negligence in the performance of their duties does not rest upon contract, but is based upon the violation of duty and is in the nature of a tort, and stockholders who are injured by their negligence may sue one or several of the joint participants.

8. Limitation of Actions. *Suit by minority stockholders for loss from directors' negligence is not governed by the three-year statute of limitations.*
   A suit in equity by stockholders against the directors of a bank for violation of their duties, as a result of which the bank becomes insolvent and the stock worthless, is a suit based upon negligence and the three-year staute of limitations governing actions based upon contracts, express or implied, has no application.

9. Banks and Banking. *Director sued for loss to stockholders from excessive loans to himself cannot plead that he did not act for the bank.*

A bank director who applies for and receives loans in excess of the capital stock of the bank, causing the bank's failure, is, in a suit by stockholders against him and the other directors for gross negligence, as a result of which the stock is made worthless, estopped to plead· that he did not act for the bank in making such improvident loans to himself.

10. BANKS AND BANKING. *Receiver's written assignment of bank's claims against negligent director construed to preserve minority stockholders' action against such director.*

Where an insolvent bank is placed in the hands of a receiver as a result of the gross negligence of the directors, and the directors execute a writing guaranteeing depositors and stockholders against loss, and the receiver under the approval and by decree of the chancery court executes a written assignment to a purchaser of the notes, securities, and claim of the bank against one particular director, a provision in the written assignment expressly excepting from the operation of the conveyance the director's "individual guaranty to depositors and stockholders" preserves the right of action by stockholders against such negligent director whose indebtedness is thereby assigned for negligence resulting in the loss of the capital stock.

11. BANKS AND BANKING. *Assignment by bank's receiver of its claim against director should be construed with reference to the circumstances.*

The written assignment by a receiver of an insolvent bank of the bills and accounts receivable and the claim of the bank against an individual member of the board of directors in pursuance of a decree authorizing the receiver to sell the bank's said claim should be construed and its scope determined by the circumstances and the purposes to be accomplished.

12. BANKRUPTCY. *Negligent bank director sued by minority stockholders cannot plead discharge in bankruptcy where demands were not reduced to judgment when discharge was granted.*

A discharge in bankruptcy cannot be pleaded in bar to a suit in equity by stockholders against a negligent director for losses occasioned by mismanagement of the bank's affairs, where the demands sued for were unliquidated and had not been reduced to a judgment at the time such discharge was granted.

13. BANKRUPTCY. *Director is "officer" within exception of debts created by fraud or defalcation.*

The director of a banking corporation is an "officer" within the meaning of section 17, subd. 4, of the Bankrupt Act (U. S. Comp. St. section 9601), excepting from discharge debts created

121 Miss.—56.

by fraud, misappropriation, or defalcation of a bankrupt while acting as an officer or in a fiduciary capacity.

14. EXECUTORS AND ADMINISTRATORS. *Unliquidated claim against negligent bank director is not a claim for probate against his estate.*

Stockholder's unliquidated claim for damages against a negligent bank director, who dies pending litigation, is not a claim for probate against the estate of a deceased person under section 2107, Code of 1906 (section 1775, Hemingway's Code).

15. BANKS AND BANKING. *"Cashier" is bank's chief executive officer.*

The "cashier" of a bank is the chief executive officer through whom the whole financial operations of a bank are conducted.

16. BANKS AND BANKING. *Cashier is liable for losses resulting from his tortious acts.*

The cashier of a bank is liable for losses resulting from his illegal, fraudulent, or tortious acts, or from his negligence.

17. BANKS AND BANKING. *Directors' authorization no defense as to cashier's negligence.*

The cashier is responsible for losses suffered directly from his failure to exercise reasonable skill and ordinary care and diligence in the discharge of his official duties. It is no defense that the directors, or any one of them, authorized him to do that which he knew, or ought to have known, was unauthorized or unlawful.

18. BANKS AND BANKING. Cashier making excessive and unauthorized *loans to a director is liable for resulting losses.*

A cashier who negotiates excessive and improvident loans to a director without authority from a majority of the board of directors is responsible for losses directly occasioned by such negligence.

19. BANKS AND BANKING. *Pledgee of stock may join in suit against directors for negligence.*

A *bona-fide* pledgee of bank stock may join as a party complainant in a stockholders' suit in equity against the directors for negligence resulting in the destruction of the stock.

20. BANKS AND BANKING. *One negligent director may not sue his associate directors for gross negligence.*

One negligent director may not sue his associate directors for gross negligence resulting in the bank's failure and a destruction of the capital stock.

21. BANKS AND BANKING. *Trustee of negligent bankrupt director cannot join in stockholders' suit against other directors for losses from their negligence.*

A trustee in bankruptcy for one negligent director, who has been adjudicated a bankrupt, should not be permitted to join as a party complainant in a suit by stockholders against the directors for gross negligence resulting in the destruction of the capital stock.

22. BANKS AND BANKING. *Executrix of negligent director cannot sue surviving negligent directors for gross negligence.*

It would be inequitable to permit the executrix of one negligent director to sue the surviving directors for damages as a result of gross negligence attributable to the entire board of directors.

23. APPEAL AND ERROR. *That record did not show decree of revival on death of complainant held not reversible error in view of record on appeal.*

Where, in a suit by stockholders against negligent directors for damages for the loss of capital stock, it is shown that one party complainant died after the cause had been submitted to the chancellor for final determination, that a proper suggestion in writing of the complainant's death is made and a petition filed asking for an administrator *ad litem* to prosecute the suit, and a final decree adjudicates recovery in the name of the administrator, such decree will not be reversed on account of the absence in the record of a decree reviving the cause in the name of the said administrator *ad litem*, especially where the record reserves no exception or objection to the said appointment or to the language of the final decree awarding recovery in the name of the administrator, and no showing whatever made that an administrator *ad litem* was not in fact appointed and the cause revived in his name.

APPEAL from chancery court of Attala county.

HON. A. Y. WOODWARD, Chancellor.

Suit by Carrie S. Applewhite and others against L. Niles Boyd and others. Decree for plaintiffs, and defendants appeal. Affirmed in part, and reversed in part.

*Green & Green, R. H. & J. H. Thompson, Fulton Thompson, S. L. Dodd* and *O. A. Lucket,* for appellants.

*Teat & Teat* and *Boothe & Pepper,* for appellee

STEVENS, J., delivered the opinion of the court.

There is involved in this proceeding the liability of the directors and officers of the C. C. Kelly Banking Company, a corporation, to the minority stockholders for alleged gross negligence in the management of the bank. The suit as now styled is a consolidation of two suits instituted by the stockholders against the said directors and officers. There were demurrers to the bills in both cases, and from decrees overruling the demurrers appellants prosecuted an appeal to this court, and the decrees of the chancery court were affirmed in *Kelly* v. *Applewhite,* 115 Miss. 5, 75 So. 753, and *Kelly* v. *Jones,* 76 So. 280. This court in passing upon the pleadings said:

"The gravamen of the bill is the neglect of duty, misconduct, and negligence of the directors, causing the bank, to become insolvent and having to go into the hands of a receiver, thereby rendering their stock valueless." 75 So. 753.

After the suits had been remanded to the trial court, answers were filed and much testimony taken, and the suit as consolidated was submitted to the chancellor for final hearing upon the pleadings and proof, and a final decree rendered sustaining the bills, finding the directors and officers guilty of negligence, and awarding the complainants damages to the extent of the book value of their stock. From this final decree appellants as defendants in the court below prosecute this appeal and assign and argue many grounds of alleged error. The facts necessary for a proper appreciation of the issues presented may be stated briefly as follows: For many years prior to 1914, the C. C. Kelly Banking Company did a general banking business at Kosciusko. Prior to 1890 the business was conducted by C. C. Kelly as a

private banker under the name of C. C. Kelly Banking House. In 1890 Mr. Kelly with others made application to the state for a charter incorporating the bank. A charter was approved by the Governor; delivered to the stockholders, and recorded in the office of the secretary of state, and in the chancery clerks office of Attala county; but the charter was not filed with the chancery clerk within one year, after the same was approved by the Governor or within one year after the Constitution of 1890 became effective. Whether the charter was valid, and whether the corporation was lawfully organized under it, are disputed questions of fact in the case. It does appear that the C. C. Kelly Banking House changed its name to C. C. Kelly Banking Company, and upon making application for a charter opened books in its corporate name, noted its capital stock at one hundred thousand dollars, purchased and had possession of a stock book, and actually issued stock to the original stockholders. The stock so issued remained in the stock book for some time and was later torn out of the book, together with the stubs. Whether this stock was actually delivered is a disputed question of fact. The company did elect directors and a president and cashier of the banking institution, and these officers assumed to act as such and served as directors and officers. In 1905 there was a reorganization; new shareholders subscribed, and certificates of stock were thereupon issued to all of the stockholders, and since March 6, 1905, the shares of stock have been bought and sold in due course of business. The capital stock remained, at the so-called reorganization, at one hundred thousand dollars, consisting of one thousand shares at the par value of one hundred dollars per share, and from the bank records all this stock has been subscribed for, issued, and fully paid, in money or its equivalent. The board of directors after March, 1905, began to hold periodic meetings, and the minutes of the directors' meetings

disclose that quarterly meetings provided by statute were held, and from these minutes it would appear that the directors attempted to examine into the securities and condition of the bank at the quarterly metings in compliance with the duty imposed by law. On February 14, 1914, the officers and directors of the bank closed the doors of the institution and applied for the appointment of a receiver, who was appointed, and the assets were thereupon placed in the hands of a receiver under the jurisdiction of the chancery court. The officers and directors who closed the bank and placed the same in the hands of the receiver owned approximately eight hundred shares of the outstanding stock; the remaining shares being owned by the appellees, complainants in this suit. In the course of the liquidation complainants discovered for the first time that the bank was hopelessly insolvent and their stock was worthless. The chancellor found that the defendants "were negligent and had mismanaged the affairs of the bank," and that they "are liable to the stockholders for the book value of the stock, together with six per cent. interest thereon from the date of the failure of the bank until paid."

The record discloses, and the chancellor found, that the active members of the board of directors were G. Lowenberg, a merchant doing a large business in the city of Kosciusko under the firm name of G. Lowenberg & Co., in which mercantile business E. Simon was a partner; J. Niles Boyd, a merchant; N. M. Falk, a cotton broker; and J. N. Alexander, a merchant. It appears that one Walter Burgess was formerly a member of the board, but died several years before the failure of the bank, and that B. L. Clark, another director, had moved to the state of Oklahoma, but there is no record of the resignation of Clark as director; and there was no effort to fill the vacancies caused by the death of Burgess and the removal of Clark. When the receiver took charge, it was ascertained that three of the

active directors, Lowenberg, Boyd, and Falk, owed the
bank the large sum of two hundred and twenty-nine
thousand dollars. Of this sum Lowenberg and the firm
of Lowenberg & Co. owed one hundred and seventy-three
thousand dollars; Boyd, forty-three thousand dollars;
and Falk, twelve thousand dollars. The indebtedness
due by Boyd and Falk was subsequently paid. The
claim of the bank against Lowenberg was, by the ap-
proval of the court, sold and assigned by the receiver
to one Joseph Ascher for a consideration of fifty thou-
sand dollars cash, thereby leaving a loss on the Lowen-
berg indebtedness of over one hundred thousand dollars.
After the assets had been realized upon, the depositors
were paid in full and nothing was left for the minority
stockholders.

On December 27, 1913, the directors, as provided by
chapters 110 and 111, Laws of 1908, prepared and pub-
lished a statement showing the condition of the bank at
the close of business December 27, 1913, and in this
sworn statement the capital stock paid in is given at one
hundred thousand dollars, surplus ten thousand dollars,
undivided profits fourteen thousand, three hundred and
thirty-nine dollars and eighty-six cents, and appended to
the statement and as a part thereof is listed the in-
debtedness due the bank by the officers and directors as
follows:

"(1) By the officers of said bank one thousand, five
hundred and thirty dollars. (2) By the stockholders and
owners of said bank two thousand, one hundred fifty-
eight dollars and thirty-eight cents. (3) By the direc-
tors of said bank fifty-nine thousand, sixty-four dollars
and twenty-four cents. When organized? 1890."

This statement according to the findings of the receiv-
er was in harmony with what the books of the bank pur-
ported to show as to its assets and liabilities, except the
real indebtedness by Lowenberg, amounting to one hun-
dred seventy-three thousand, four hundred ninety-two

dollars, and ninety-seven cents, is not included in the amounts purporting to have been loaned the directors, but appears under the general designation of loans, discounts, and overdrafts. Each of the directors who was so largely indebted to the bank had large overdrafts. The receiver's audit of the books further shows that the book value of the stock in February, 1914, when the bank went into the hands of the receiver, was approximately, one hundred twenty-three dollars per share. Appellants do not dispute the fact that excessive loans were made to Gustave Lowenberg and admit that the bank's failure was "attributable to improvident loans of large sums of money made to Gustave Lowenberg." Soon after the bank was placed in the hands of the receiver, Lowenberg went into bankruptcy, and the bankruptcy court took jurisdiction of and administered his assets, and in March, 1914, Lowenberg received his discharge in bankruptcy. Lowenberg's indebtedness to the bank was duly scheduled in the bankruptcy court, and the bank and its receiver appear to have had notice of the bankruptcy proceeding; but any claim of appellees against Lowenberg for damages was not scheduled, and appellees were not listed as creditors. Pending the suits, Lowenberg died, and Clara Lowenberg, executrix of his will, assumed to administer upon his estate, and this suit was revived against her as personal representative of the decedent.

B. L. Clark appears to have served as a director from 1905 until January meeting, 1911, and signed the statements prepared for the board of directors; but there is no record that he was present at any subsequent meeting, or that he had any further active connection with the bank.

It appears that Burgess was a director and participated in the meetings until January, 1912. Director Alexander did not owe the bank anything but, on the contrary, had a deposit in the bank.

There is evidence tending to prove that before the doors of the bank were closed the directors held a meeting in an effort to avert a crisis. Lowenberg was then pressed for some definite promise or adjustment or his large indebtedness, but responded that he could do nothing. The directors decided that the institution must be closed and voluntarily asked for the appointment of a receiver.

J. M. Knotts, a defendant in the action, was the cashier. The bill of complaint name him as a director and officer, but the record discloses that, while he served for a time as director, he resigned prior to the time it is alleged the losses of the bank accumulated. It is charged in the bill, and the proof tends to show, that the excessive loans to Lowenberg and others began in 1909 and steadily increased until the bank failed. During this period of time Knotts served as the active cashier and C. C. Kelly as president. Directors Boyd, Falk, and Alexander defendant upon the theory that they had no actual knowledge that Lowenberg owed the bank anything like so large a sum, and only ascertained the fact immediately prior to the time the receiver was applied for. Knotts, the cashier, defends largely upon the theory that C. C. Kelly, the president, was the largest stockholder and the dominant influence in the bank and authorized most of the loans; that no by-laws were adopted; and that the cashier put into execution the wishes of and obeyed the orders of the president.

The defendants introduced testimony tending to show that the regular directors' meetings were held after 4 o'clock in the afternoons when the actual notes and securities of the bank were locked into the vault, and that the president would call upon Mr. Lowenberg to read aloud the bills receivable held by the bank, and that Mr. Lowenberg in doing so would omit to read aloud or advise his associates of the large items constituting his individual indebtedness or liability to the bank, and that

on this account Boyd, Falk, and Alexander were kept in ignorance of this excessive loan. There is further evidence tending to prove that the directors reposed great confidence in the president as also in Mr. Lowenberg.

For the complainants there is evidence tending to prove that the directors did not in fact examine into the securities and true state of affairs of the bank at any of their meetings; that they did not count the cash, or scrutinize carefully the securities held by the bank, but negligently permitted the president and cashier to make large and excessive loans to the directors; and that these excessive loans wrecked the institution and made worthless the complainants' stock.

In the prosecution of this appeal, appellants, Boyd, Alexander, and Falk submit the following points:

(1) That the chancellor erred in refusing to award a jury trial as prayed for.

(2) That the C. C. Kelly Banking Company was not lawfully incorporated, in that: (a) The charter was approved by the Governor contrary to the advice and opinion of the Attorney General; (b) that a copy of said charter was not seasonably recorded as required by the statute and as a consequence thereof the stockholders were liable as partners; (c) that no organization took place and business commenced under the charter within one year after 1890 in compliance with section 180 of the Constitution, providing:

"All such charters under which organization shall not take place in good faith and business be commenced within one year from the adoption of this Constitution, shall thereafter have no validity.'

(3) That negligence has not been sufficiently proven.

(4) That the cause of action is barred by the three-year statute of limitation.

(5) That an alleged guaranty executed by the directors "Exhibit K," is without consideration, and furthermore is the product of duress, and no liability can be predicated thereon.

(6) It was error to grant relief to Mrs. Walter Burgess or to Mrs. Fannie Burgess, executrix, or to grant relief to S. P. Rimmer pledgee of the stock issued to and owned by director B. L. Clark, or to grant any relief to W. R. Witherington, trustee in bankruptcy of B. L. Clark ,and lastly that book value is not the measure of damages.

Separate briefs are on file in behalf of Clara Lowenberg, executrix of the estate of Gustave Lowenberg, deceased, arguing the general propositions: First, that Lowenberg could not and did not act for the bank in borrowing the large sums of money from the bank, and is not guilty of negligence in making loans to himself or to any other person. Second, that the bank assigned all claims of the bankrupt to Ascher, and that this conveyance carries whatever interest appellees had in the bank and whatever right appellees had as against the directors. Third, the discharge in bankruptcy released Lowenberg from liability for all provable debts including any liability to appellees. Fourth, that appellees did not probate any claims against the estate of Lowenberg in the state court, and on that account their claim is barred. Fifth, that the cause of action is barred by the three-year statute of limitation.

Mr. Knotts, the cashier, by separate brief, contends that no decree can be entered against him based on negligence for the reasons that the directors were empowered by the charter to enact proper by-laws, that no by-laws were adopted, that the cashier has violated no by-laws or rule of the banking institution, and that his acts generally were consistent with the duties imposed upon him by usage and by the directions of his superior officer, the president.

There is proof tending to show that appellants executed a written agreement referred to above as "Exhibit K," whereby they obligated themselves to pay to the receiver within twelve months such sum as would be

required to make the entire assets of the bank amount to the sum of two hundred, ninety-three thousand, two hundred dollars and forty-seven cents, and guaranteeing the payment of all depositors in full, and also the book value of the stock held by appellees. This agreement is in the following language:

"State of Mississippi, County of Attala.

"In consideration of a release from liability to the creditors of the defunct C. C. Kelly Banking Company of Kosciusko, Mississippi, which said creditors hold against us, we, the directors, officers and officials of said banking company, agree and do hereby release and relinquish all claims against said banking company which are held by us, and to pay to E. Carr, receiver of said banking company, or any successor thereof, within twelve months from this date, such sum as is required to make the entire assets of said banking company amount to the sum of two hundred ninety-three thousand two hundred dollars and forty-four cents, exclusive of all claims for expenses of the receivership of said banking company; it being our intention and we do hereby agree to guarantee the payment of all of the depositors of said banking company in full, and the following stockholders the book value of the capital stock of said banking company held by them, to wit: Mrs. Fannie L. Burgess, five shares; S. J. Winters, five shares; Mrs. Minnie Orr, ten shares; Mrs. Birdie Dodson, ten shares; Carrie Sue Applewhite, five shares; J. M. Chestnutt, ten shares; W. M. Breazeale, five shares; J. A. Teat, twenty shares; R. A. Clarke, five shares; W. E. Jones, fifteen shars; E. W. Curry, five shares; J. A. Kelly, twenty shares; R. G. McCoy, ten shares; M. C. Hollingsworth, ten shares; W. E. Sanders, five shares. Witness our signatures on this 12th day of March, 1914. (Signed) J. Niles Boyd, N. M. Falk, G. Lowenberg, C. C. Kelly, J. N. Alexander, J. M. Knotts, R. E. Kelly."

The written assignment executed by the receiver to Joseph Ascher above referred to is as follows:

"For value received from Joseph Ascher, by terms of contract and bond, this day executed, by the terms of which contract, the undersigned has sold, transferred, assigned and set over and delivered to said Ascher all claims of every character and description held against the firm of G. Lowenberg & Company and G. Lowenberg and E. Simon individually, the undersigned, by authority of the chancery court of Attala county, Mississippi, hereby relinquishes all claims of every character and description against said G. Lowenberg & Company and said G. Lowenberg and said E. Simon; the said Joseph Ascher having become the absolute owner of all of such claims heretofore held by the C. C. Kelly Banking Company, and now held by me as receiver of said C. C. Kelly Banking Company; the undersigned having held back and retained no claim of any character or description against either said firm of G. Lowenberg & Company or G. Lowenberg and said E. Simon except his individual guarantee to depositors and stockholders, Ascher having purchased all claims, indebtedness, and securities held by said banking company, and by the undersigned receiver.

"Witness my signature this March 16, 1914.

"[Signed] E. Carr, Receiver."

The facts in reference to any liability of appellants to Mrs. Fannie Burgess, administratrix, and to the trustee in bankruptcy of B. L. Clark, will be subsequently stated in discussing the legal questions involved. So also with reference to the pertinent facts as to the recovery awarded George L. Teat, administrator of L. M. Kelly, deceased.

We shall dispose of the very many points argued by counsel without a discussion of each point separately or in the order in which they are submitted in counsel's briefs. The general contention that there is no liability shown may be disposed of by the application of

well-known principles of law. On the main question of
liability there is abundant testimony to support the find-
ings of fact and the final decree entered by the learned
chancellor. There is proof tending to show that, from
1909 until the failure of the bank, appellants were ac-
tive directors in full charge of the bank; that they own-
ed more than three-fourths of the capital stock; that they
assumed to discharge their duties as directors and held
quarterly meetings and issued quarterly statements in
January, April, July, and October of each year as pro-
vided by statute; that at these meetings they assumed
to make a personal inspection of the books, accounts,
and securities of the bank and rendered sworn state-
ments to the auditor of public accounts as provided by
law, and published these statements in a local news-
paper at Kosciusko. It is shown that the statements
made to the auditor and published to the world did not
reflect the true condition of the bank; that the directors
did not in fact make a sufficient inspection of the books
and securities of the bank, but relied upon the presi-
dent and cashier; that the president and cashier made
excessive and improvident loans; and that these im-
provident loans rendered the bank insolvent, wrecked
the institution, and led to the appointment of a receiver.

At the time the bank failed, G. Lowenberg and the
partnership of G. Lowenberg & Co. owed the bank ap-
proximately one hundred seventy-three thousand dol-
lars. J. Niles Boyd owed approximately forty thousand
dollars individually and some five thousand dollars or
six thousand dollars as indorser. Appellant Falk owed
twelve thousand dollars by overdraft. The capital stock
of the bank was one hundred thousand dollars. The
president and cashier permitted the directors to over-
draw from time to time and permitted the Lowenberg
indebtedness steadily to increase from year to year un-
till it reached a sum in itself sufficiently large to impair
the capital and crush the institution.

The real defense interposed by appellants is their ignorance of the true condition of the bank. Appellants Boyd, Falk, and Alexander especially contend that they did not know that Lowenberg owed the bank any such appalling sum. They attempt to justify their ignorance on the ground that the meetings of the directors were held after banking hours when the time-locked vaults of the bank were closed, and that Mr. Lowenberg misread the discount register and failed to read out the large indebtedness due by him or to advise his associates in reference thereto. It is in evidence, however, that the bills receivable register showed the loans; that this book was actually present at the quarterly meeting; and that appellants made no effort to examine this book carefully, or to examine the other books of the bank, made no inquiry into the true *status* of the Lowenberg indebtedness, whether increasing or decreasing, enacted no by-laws whereby officers would be restrained in making loans and taking securities, and in fact failed to perform the duties imposed by statute as well as by good banking. It appears that appellants were business men engaged in and about their own affairs and were large borrowers from their own institutions.

The directors cannot successfully plead their own ignorance as against the claims of appellees, the innocent stockholders, under the circumstances made by this record. The law of the case is well settled. In *Ellis* v. *Mercantile Co.*, 103 Miss. 560, 60 So. 649, 43 L. R. A. (N. S.) 982, Ann. Cas. 1915B, 526, our court by Judge Reed observes:

"The chief contention by appellants is that directors are not liable for losses sustained on account of their negligence in managing the affairs of the bank. The board of directors is the governing body of a bank. As such managing body, they exercise, conduct, and control

all corporate powers. To the directors is committed the general management of the affairs of the bank.''

And in quoting from Thompson on Corporations:

''They are responsible for loss resulting from the wrongful acts or omissions of other directors or agents, where such loss was a consequence of their own neglect of duty, either in failing to supervise the company's business with proper attention or in neglecting to use proper care in the appointment of such agents.'' *Ellis* v. *Mercantile Co.,* 103 Miss. 560, 60 So. 649, 43 L. R. A. (N. S.), 982, Ann. Cas. 1915B, 526.

The principles of law announced in the Ellis Case are controlling, and in fact the governing authorities in this case were clearly indicated by our court, speaking through Judge SYKES, in disposing of the demurrers. *Kelly* v. *Applewhite,* 75 So. 753. The applicable principles of law are likewise indicated and discussed by the supreme court of the United States in *Bowerman* v. *Hamner,* 250 U. S. 504, 39 Sup. Ct. 549, 63 L. Ed. 1113, advance opinions, October term 1918, in which the supreme court, by Mr. Justice CLARKE, quoted with approval from *Brigg* v. *Spaulding,* 141 U. S. 132, 11 Sup. Ct. 924, 35 L. Ed. 662, and *Martin* v. *Webb,* 110 U. S. 7, 3 Sup. Ct. 428, 28 L. Ed. 49, and announced as utterly untenable any view that the directors can officiate as ''figureheads,'' or plead utter ignorance of that which a reasonable examination of the books and papers of the bank would disclose. The court there observed:

''That a director who never makes, or causes to be made any examination whatever of the books or papers of the bank to determine its condition, and the way in which it is being conducted, does not exercise ordinary care and prudence in the management of the affairs of the bank,'' and a director so offending ''cannot be shielded from liability because of want of knowledge of wrongdoing on his part, since that ignorance was the

result of gross inattention in the discharge of his voluntarily assumed and sworn duty.''

The court further approves the following statement in the prior case of *Martin* v. *Webb, supra*:

''Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than from time to time to elect officers of the bank and to make declarations of dividends. That which they ought, by proper diligence, to have known as to the general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business.''

The observations of the supreme court of the United States are in accord with the rulings of this court in *Ellis* v. *Mercantile Co., supra, Ventress* v. *Wallace,* 111 Miss. 357, 71 So. 636, L. R. A. 1917A, 971, and other adjudications of our own jurisdiction. This law the chancellor evidently followed, and certainly we cannot say that his finding of fact are clearly wrong. It may be conceded that appellants are not guilty of criminal conduct. It yet remains that they did not exercise that degree of care in managing the bank that ordinarily prudent and diligent men would exercise under similar circumstances in the conduct and management of their own business. On the law and the facts therefore a case of liability is shown.

There is no merit in the assignment that appellants asked for and were refused a jury trial. Section 503, Hemingway's Code (Acts 1910, chapter 135), providing that, ''all questions of negligence and contributory negligence shall be for the jury to determine,'' has no controlling application in an equity case.

It is contended that the C. C. Kelly Banking Company was never lawfully incorporated, and therefore that appellants were never directors. This argument is based upon two contentions:

First, that under section 1028, Code of 1880, the Governor in approving a charter was required to "take the advice of the attorney general as to the constitutionality and legality of the provisions of such charter." That the attorney-general declined to approve a portion of section 4 of the charter. That the attorney-general made the following conditional approval:

"if that part of section 4 between cross marks be stricken out, the within charter will be free from objection."

That thereupon the Governor wrote the following indorsement and approval:

"The within and foregoing charter, including the whole of section 4, is hereby approved, the attorney-general's opinion to the contrary notwithstanding."

That under such circumstances the charter was illegally approved. That portion of section 4 objected to simply provided that—

"Upon the withdrawal of any stockholder from said banking company the liability of such stockholder shall cease from the date of such withdrawal as against all contracts thereafter made by said banking company."

Secondly, it is contended that section 180, Constitution of 1890, required organization in good faith and business to be commenced within one year from the adoption of the Constitution, and that this constitutional provision was not complied with within the prescribed period. There is some evidence tending to prove organization as soon as the charter was issued and approved. Books were opened in the new corporate name, a stock book secured and stock actually issued, and statements were subsequently rendered to the auditor of

public accounts under oath expressly stating that the company was organized in 1890. But aside from the showing made on the facts we are led to the conclusion that appellants are in no position to plead that they were not directors of a corporation. Certainly there was a valid law under which a charter could be issued to a banking company. A charter was in fact issued. There were in fact stockholders. These stockholders in fact elected a board of directors, and appellants in fact accepted the position of directors and assumed to discharge the duties of this office. They cannot in equity and good conscience now be heard to say as against the stockholders that they do not occupy the position of managing directors and trustees. The sovereign state has not seen fit to complain, and appellants are in no position to complain as against the stockholders who uder the facts have been wronged by a failure of the directors to perform the duties which they have voluntarily assumed. Under this view it is unnecessary to determine whether the charter as issued and accepted was void or invalid.

There is no merit, we think, in the contention that the cause of action is barred by the three-year statute of limitation. The observations of this court in *Ventress* v. *Wallace, supra,* are controlling. It was expressly argued in the Ventress-Wallace Case that equity had no jurisdiction of a suit by the receiver of a defunct banking institution against the negligent directors and officers, and in response to this argument the court observed:

"It is earnestly contended that this is an action in tort, and that the equity court is not the proper forum."

And after discussing the *status* of directors and certain pertinent authorities, the jurisdiction of equity was justified and upheld, notwithstanding the fact that the action is one based upon the gross negligence or, in other words, the wrongdoing of the directors.

·The very recent case of *Corsicana National Bank* v. *Johnson*, 251 U. S. 68, 40 Sup. Ct. 82, 65 L. Ed.,—, advance opinions, January 1, 1920, while an action based upon federal statutes, has some bearing upon the point under discussion. The court, by Mr. Justice Pitney, observes:

"The violation is in the nature of a tort, and the party injured may sue one or several of the joint participants."

The liability does not rest upon contract, but upon the failure of the directors and officers to perform their duty and, as said by Judge Terral in *Wolfe* v. *Smmons*, 75 Miss. 539, 23 So. 586:

"Every person undertaking to act for others is presumed as undertaking to act with integrity, diligence, and skill, and an action on the case for damages lay for a breach of such duties"—citing 3 Blackstone, Commentaries, 165.

The failure of duty in the case at bar is imposed both by the common law and by statute. It might well be observed in this connection that the suit is not based primarily upon any statute or upon the written guaranty above quoted. It is based upon negligence. It follows that the three-year statute of limitations does not apply. This being true, the suits are not barred by any of our statutes of limitation. It affirmatively appears that appellees did not know that the bank was insolvent or that their investments were in jeopardy until the bank was placed in the hands of a receiver, and then appellees' damages could not be made certain until after the affairs of the bank were sufficiently administered to determine whether the stock had any value. The bank was placed in the hands of a receiver in March, 1914, and the original bill in this case was filed July 9, 1915. There was a seasonable institution of the suits.

We come now to the discussion of the liability of the estate of Gustave Lowenberg, deceased. There is no

merit, we think, in any of the separate contentions on behalf of the executrix of this estate. It is contended that Mr. Lowenberg in borrowing money from the bank could not and did not act for the bank in making loans to himself, that these excessive loans to Lowenberg caused the failure of the bank, and that this negligence cannot be laid to Lowenberg because he was the borrower and not the lender. This argument, we think, is absolutely unsound. The very fact that Lowenberg was applying for improvident loans necessarily placed him in more or less of an inconsistent position and required of him, if anything, a greater degree of care. The very defense of a majority of the board in this case is bottomed upon the attempt to show that the excessive loans to Lowenberg were made by the president and cashier without the knowledge or consent of the other directors. If this be true, and the testimony so indicates, then Lowenberg while a director permitted either the president or the cashier, or both, to extend him a line of credit largely in excess of the full amount of the capital stock, and that without authority of the managing board. It is elementary that no one can profit by his own wrong; and the contention made is untenable.

It is next contended that the written assignment by the receiver to Ascher carried with it an assignment of the bank's claim against appellees for damages. The sufficient answer to this is the fact that the written assignment itself expressly excepts Lowenberg's "individual guarantee to depositors and stockholders." In other words, the very terms of the instrument excepts the rights of the stockholders in this case. There is indeed a further contention that this exception refers to the written guaranty executed by the directors and referred to in this record as "Exhibit K;" that this written guaranty is without consideration and a product of duress and therefore void. The chancellor made no specific findings of fact in the case, but entered a general

decree against appellants, and we are not justified in assuming that the chancellor condemned the written guaranty on account of any alleged duress. But, regardless of any question of duress, we think the exception is broad enough to reserve appellees' rights. The assignment to Ascher should be construed in the light of the circumstances surrounding its execution and the purpose to be accomplished. The bank held certain well-defined notes and securities against Lowenberg and the partnership of Lowenberg & Co., and it was primarily these bills and accounts receivable, and the securities pledged to secure the same, that the receiver was undertaking to convey. This written assignment had the sanction of the court, and its scope must be determined, as stated, by the circumstances and purposes. *Pell et al* v. *McCabe et al.,* 250 U. S. 573, 40 Sup. Ct. 43, 63 L. Ed. 1147, advances sheets, December 15, 1919. Lowenberg and the other directors by writing, at least acknowledged their liability to the stockholders and voluntarily agreed to make good the book value of appellees' stock. It matters not in equity whether this right is supported by valuable consideration or not. The present suit is not based upon the writing, but upon general liability, and there is certainly in the written assignment to Ascher language indicating the intention of the parties to reserve the stockholders' rights as against Lowenberg. The intention of the parties to this written assignment should govern, and the instrument as a whole gives no internal evidence of an intention on the part of the receiver to relinquish the claim of appelees as stokholders.

We next advert to the contention that Lowenberg's discharge in bankruptcy is a bar to the claim of liability here sought to be enforced. his argument is based, we think, upon the erroneous assumption that the liability is one in contract. As before stated, the action is in the nature of a tort predicated upon the

breach of official duty and no judgment had been render-
ed, and therefore the claim had not been liquidated
when the discharge was granted. As we understand
the Bankruptcy Law, neither the Act of 1898 (U. S.
Comp. St. sections 9585-9656) nor the amendment of
1903 makes any provision for discharging liabilities for
torts unless the same have been reduced to judgment.
Collier on Bankruptcy (9th Ed.) p. 386.

The proof shows that Lowenberg went into bankrupt-
cy soon after the failure of the bank and received his
discharge before the assets of the bank had been fully
administered in the chancery court and before appellees
could possibly tell to what extent they had been damaged
by the mismanagen ent of the directors. Appellees were
not even scheduled as creditors, and their claim at the
time of the discharge was necessarily an unliquidated
demand for damages, and these damages are now for
the first time ultimately and finally fixed by an affirm-
ance of the case at bar. There is perhaps another and
very sufficient reason why counsel's contention is
wrong. Under subdivision 4, par. 17 of the Bankrupt
Act (U. S. Comp. St. section 9601), the discharge in bank-
ruptcy does not release a claim based upon the fraud,
embezzlement, misappropriation, or defalcation of a
bankrupt while acting as an officer or in any fiduciary
capacity. In the act of 1867, the phrase "public officer"
is employed. This by the act of 1898 is changed to
"officer." This provision of the bankrupt law was un-
der consideration by McDowell, District Judge, in the
case of *In re Harper* (D. C.), 133 Fed. 970. The opinion,
among other things, says:

"The substitution of the word 'officer' for the phrase
'public officer' cannot properly be considered uninten-
tional. The exact phraseology of such legislation is of
too great importance to justify such a presumption. The
change of language, therefore, evidenced some change
of meaning, and I have been unable to ascribe to it any

other change of meaning than to include officers of private corporations. The word 'officer' is clearly of broader meaning than the words 'public officer.' That a director and vice president of a private corporation, such as a national banking association, is an officer' of such corporation, not only in popular language, but in the language of almost countless judicial decisions and law text-books, and the acts of Congress (see, for instance, section 1, cl. 19, Bankr. Act. 1898, 30 Stat. 545 [U. S. Comp. St. 1901, p. 3419]; sections 1783, 5207, 5208, Rev. St. [U. S. Comp. St. 1901, pp. 1213, 3496, 3497]), will not be disputed.''

This case was affirmed by the circuit court of appeals in *Harper* v. *Rankin,* 141 Fed. 626, 72 C. C. A. 320. The' opinion of the circuit court of appeals by Boyd, District Judge, did not expressly pass upon the question as to whether the change in phraseology ''had the effect to enlarge the scope of the law,'' but observes that Judge McDowell ''supports his decision by forceful argument.,' The court further ruled that, inasmuch as Harper was the vice president and in general charge of the affairs of the bank, he was therefore ''acting in a fiduciary capacity.'' The present case is, of course, somewhat different from the Harper Case, but the construction given paragraph 17 of the Bankruptcy Act is applicable, and this view is further strengthened by the opinion of Hand, District Judge, in the case of *In re Gulick* (D. C.), 26 Am. Bankr. Rep. 362, 186 Fed. 350, in which the opinion in *In re Harper, supra,* was followed and approved. See, also, 7 C. J. 407.

For the reasons indicated, Lowenberg was not discharged from liability in this case.

It is next contended that the failure to register and probate the claim in the chancery court having jurisdiction of Lowenberg's estate within one year after the first publication of notice to creditors as provided by section 1775, Hemingway's Code, bars any action there-

on. This question, we think, has been put at rest by previous adjudications of our court. Judge Calhoon, speaking for this court in *Feld* v. *Borodofski,* 87 Miss. 727, 40 So. 816, said:

"We do not think a claim for damages is one for probate against the estate of a deceased person, under Code 1892, section 1933. That section has reference to contractual claims, and not to those *ex delicto.* It must be such a claim as might be paid, if the estate were solvent, by an executor or administrator, and which, if *bona-fide* and proper, would afford him protection. *Sumrall* v. *Sumrall,* 24 Miss. 258. This could never be with an uncertain demand for damages for assault and battery. The claim to be probated must be one which, if paid by the executor or administrator, would, *prima-facie,* entitle him to credit. *Gray* v. *Harris,* 43 Miss. 421. The terms of the statute fully sustain this, as does the reasoning of the court in *Robinett* v. *Starling,* 72 Miss. 652, 18 So. 421."

And it seems to us in the case at bar that the reasoning of our court in *Robinett* v. *Starling,* referred to by Judge Calhoon, and likewise the reasoning of our court in *Jones* v. *Bank,* 71 Miss. 1023, 16 So. 344, are applicable to the facts of the present suit. This we believe disposes of all separate contentions made by Clara Lowenberg, executrix.

Can the liability imposed by the final decree against J. M. Knotts, cashier of the bank, be sustained? The proof shows that Knotts was a director prior to January, 1908, since which time he was the cashier in the active discharge of his duties. During the period complained of he was not a director, but the cashier. It is contended that he is not chargeable with any neglect of duty and that he should not be required to respond in damages for any failure of the directors properly to manage the institution. We have given the separate contention of the cashier protracted consideration and

reach the conclusion that there is sufficient evidence to support the general decree rendered against him. Mr. Morse says:

"The cashier is the chief executive officer, through whom the whole financial operations of the bank are conducted. . . . He is properly the executive agent of the directors." Morse on Banks (5th Ed.), section 152.

In *Merchants' Nat. Bank* v. *State Nat. Bank,* 10 Wall. 604, 19 L. Ed. 1008, the supreme court of the United States, by Mr. Justice SWAYNE, observed:

"The cashier is the executive officer, through whom the whole financial operations of the bank are conducted. He receives and pays out its moneys, collects and pays its debts, and receives and transfers its commercial securities. Tellers and other subordinate officers may be appointed, but they are under his direction, and are, as it were, the arms by which designated portions of his various functions are discharged. A teller may be clothed with the power to certify checks, but this in itself would not affect the right of the cashier to do the same thing. The directors may limit this authority as they deem proper, but this would not affect those to whom the limitation was unknown. *Bank* v. *Norton,* 1 Hill, 501; *Bank of Vergennes* v. *Warren,* 7 Hill, 94; *Beers* v. *Phœnix Glass Co.,* 14 Barb. 358; *Far & Mech. Bank.* v. *Butchers' & Drov. Bank,* 14 N. Y. 624; *Bank* v. *Aymar,* 3 Hill, 262; *Barnes* v. *Bank,* 19 N. Y. 156."

It is said in 7 C. J. 567: "The cashier is liable for losses resulting from his illegal, fraudulent, or tortious acts, or from his negligence."

The proper limitations upon this civil liability are then discussed in Corpus Juris, but we do not regard the facts of the present case as bringing the cashier within any of the exceptions noted and discussed by the author. A fair statement of the law is contained, we think, in *Wynne* v. *Tallapoosa County Bank,* 168 Ala.

469, 53 So. 228. The court, by Mayfield, J., on this point says:

"As to the liability of the cashier to the bank, for allowing overdrafts by depositors, for taking improper securities for loans made by the bank, and for failing to conform to the by-laws of the corporation, as to making loans without conferring with the discount board, etc., we think the law different from that which the chancellor seems to have applied to this case. It is true, as contended by counsel for appellee, and as the chancellor seems to have decided, that the cashier of a bank is responsible to the bank for all losses it suffers directly from his failure in any respect in his official duty, and that it cannot avail him that he was so ordered or authorized so to act, by the directors, if the directors had no authority to so order or direct him, nor to do the acts themselves which they authorized him to do, and he knows or ought to know that such act done or authorized was unlawful. But a bank, like any other corporation, can act only by and through its officers and agents, and if the directors themselves can do an act, so far as they or the bank is concerned, they can authorize the cashier to do it; and if he does it under their authority, he is not liable to them or to the bank, though he might be in some cases liable to third parties. He is likewise liable to the bank for all damages it suffers on account of any wrongful official acts of his, or of any from any unauthorized assumption of power on his part, or for any from his failure to obey any proper and valid instruction from his superior officers in the bank. He is not liable, as the directors are, for the errors or improper acts of his subordinate officers such as tellers, bookkeepers, etc., or agents in the bank."

In *Austin* v. *Daniels,* 4 Denio (N. Y.) 299, the opinion states:

"Bank officers are but agents of the corporation, and if they transcend or abuse their powers are as much

responsible to their principal as are the agents of an individual. This ought to be regarded as too plain to require argument or authority.''

And in *Commercial Bank* v. *Ten Eyck,* 48 N. Y. 305, the court by EARL, C., said.

''The defendant, as cashier, was a financial agent of the plaintiff, intrusted to some extent with the management of its affairs. As such agent he was bound to exercise reasonable skill and ordinary care and diligence in the discharge of his duties. Story's Agency, section 182, etc. If he failed in such skill or omitted such care and diligence, and in consequence thereof the plaintiff suffered damages, he is liable to respond. And much more is he liable to respond if he caused any damage to the plaintiff by any illegal, fraudulent, or tortious act.''

There is no proof in this case that Knotts appropriated any of the funds of the bank, but there is evidence to show that he very negligently made excessive loans and permitted the directors themselves to overdraw very largely their accounts. Mr. Kelly, the president, testified that perhaps ninety per cent. of all loans were actually made by the cashier. It is undisputed that the notes and securities executed by Lowenberg and the other directors were in the handwriting of Mr. Knotts and his assistant, and there is no attempt to deny knowledge by the cashier that Lowenberg was borrowing too much money from the bank. The cashier is in the attitude of negotiating these loans and permitting these overdrafts without authority from the board of directors, or at least a majority of them. The point is made that the bank had no by-laws and therefore the cashier violated no by-laws or rule of the institution. The fact that there were no by-laws can be no justification for the failure of the cashier reasonably to perform his duty as the chief executive officer of the bank. If Mr. Knotts had advised the directors, Boyd, Falk, or Alexander, of

the true condition of Lowenberg's account, the failure of the bank would probably have been averted. He did not take counsel with the very directors for whom he was acting, but acquiesced in and permitted the president to sanction and himself executed loans that were wrong and unlawful. This is sufficient to uphold liability. We do not mean to hold that the cashier is responsible for excessive loans authorized by the board of directors. If the acts of the cashier are not first approved by the board of directors and he proceeds upon his own judgment in the premises, then certainly he is bound to exercise that degree of skill and care and diligence required of an agent generally.

But there are other specific points which on this record are troubling. In the first place, B. L. Clark was a director from March, 1905, until the failure of the bank, so far as the bank records show. It appears that he was present at the meetings of the board from March, 1905, to 1910, an that he signed the statements of the directors rendered the auditor up until October, 1910. Soon thereafter he moved to Oklahoma, but seems never to have tendered his resignation, and no successor was elected. Clark became indebted to one S. P. Rimmer and assigned his stock to Rimmer as collateral security for a loan of four thousand, eight hundred and fifteen dollars. Thereafter Clark failed in business and went into bankruptcy, and one Witherington was appointed his trustee in bankruptcy. The bill charged that the forty-five shares of stock had been transferred and delivered to Rimmer and that Rimmer was the *bona-fide* holder thereof; that Rimmer had a settlement with Clark whereby Clark executed his note due January 1, 1915, for four thousand, five hundred dollars; and that this note was secured by forty shares of the stock. Both Rimmer and Witherington joined as complainants, and Rimmer as pledgee was permitted to recover as pledgee to the extent of his note; and Witherington,

trustee in bankruptcy, was permitted to recover for the balance of the book value of the B. L. Clark stock. The suit in this case is predicated upon the idea that the losses through the negligence of the directors accumulated from 1909 to 1914. We are led to the conclusion that Rimmer as a *bona-fide* pledgee of this stock should be permitted in equity to sue for and recover for its destruction by the directors, but that the trustee in bankruptcy has no superior right than the bankrupt enjoys in his own person, and that, inasmuch as B. L. Clark could not maintain this suit as against his fellow directors, his trustee cannot maintain the same. The decree allowing Witherington, trustee, a recovery in excess of Rimmer's note, will be reversed.

It appears that Mrs. Walter Burgess sues in her own right and as executrix of the will of Walter Burgess, deceased. We understand that Mrs. Burgess owns stock in her own right and claims some of the stock as executrix of her husband's will. It appears further that Walter Burgess was a director from January 3, 1908, until 1912, and that he signed statements with the other directors up to the time of his death, and while living was supposed to be an active director in the bank. There is testimony indicating that Capt. Burgess was in ill health and on that account was in ignorance of the bad management of the bank. We do not think, however, that a director is in a position to profit by his own negligence, and it woud be inequitable to permit one negligent director to sue and recover damages, as the result of gross negligence attributable to the entire board of directors. If so, such director should sue himself. No fact or circumstance has been pointed to that would estop Mrs. Burgess to recover upon her individual stock, and to that extent the finding of the chancellor will be upheld.. That portion of the decree which awards a recovery to Mrs. Fannie Burgess, executrix of the estate of Wal-

ter Burgess, deceased, will be reversed, and judgment entered here for appellants on this point.

The decree in favor of L. M. Kelly is attacked on two grounds: First, upon the theory that L. M. Kelly was not the true legal owner of the stock which he sues for; and, second, pending litigation he died and there was no legal revivor in the name of his personal representative. On the first ground of attack the proof is sufficient to uphold the decree rendered by the chancellor. On the second ground we do not think that appellants are in a position to complain. It is contended that there is no pleading to support a decree in favor of George L. Teat, administrator of the estate of L. M. Kelly, and no lawful revivor. It is conceded that Kelly died in October, 1918, in vacation, after the cause had been submitted to the chancellor for final determination. It is conceded further that George L. Teat, solicitor for L. M. Kelly, properly filed in the court a written suggestion of the death of L. M. Kelly, and asked for the appointment of an administrator *ad litem* as provided in section 2019, Code of 1906. There is no decree in this record actually reviving the cause in the name of George L. Teat, administrator, but the final decree does adjudicate:

"That George L. Teat, administrator of the estate of L. M. Kelly, deceased, owner and holder of fifty shares of said stock, do have and recover," etc.

There was recently filed in this court a motion for a writ of *certiorari* requiring the clerk to certify as a part of the present record the petition for the appointment of George L. Teat as administrator and the decree acting upon this petition and making the appointment. This motion was resisted by appellants on the general ground that such record is not properly a part of the present record, and their contention on a former day of this term was upheld. The present record reserves

no exceptions or objections to the appointment of the administrator or to the language of the final decree permitting recovery in the name of the administrator, and the point therefore appears to be a technical one. We are asked to reverse that portion of the decree for a reason never advanced or presented to the trial court, and this without any effort to show by the record or otherwise that the administrator was not in fact lawfully appointed pending litigation. If Mr. Teat was in fact lawfully appointed administrator, and no one disputes this fact, then the final decree is proper and lawful. It is certainly not void on its face, and no equitable showing has been made as to why the case should be reversed on this point.

That portion of the final decree awarding damages to Mrs. Burgess as executrix and to Witherington as trustee in bankruptcy of B. L. Clark is reversed, but the adjudication in favor of the other complainants in the bill is affirmed.

Equity suggests that the costs be prorated. Taking into consideration the number of original complainants and the many issues presented by the one voluminous record, we are of the opinion and direct that one-eighth of the costs of this appeal be taxed against appellees Mrs. Fannie Burgess, executrix, and Witherington, trustee; the remaining costs to be paid by appellants.

*Affirmed in part; reversed in part.*